IN THE MATTER OF THE REQUEST FOR SOLID WASTE UTILITY CUSTOMER LISTS.

Argued October 20, 1986—Decided April 16, 1987.

---

510

*Dennis A. Estis* argued the cause for appellants on Schedules B, C, D, E, F, G, and H (Appendix; at 525–528) (*Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein,* attorneys for appellant on Schedule F; *Carella, Byrne, Bain, & Gilfillan,* attorneys for appellants on Schedule B; *Vincent J. Dotoli,* attorney for appellants on Schedule C; *Riccardelli, Gasiorowski, & De Massi,* attorneys for appellants on Schedules D and H; *Scerbo, Kobin, Litwin, & Wolff,* attorneys for appellants on Schedule E; *John A. Gonnella,* attorney for appellants on Schedule G; *Dennis A. Estis* and *Sharon L. Levine* on the brief).

*Cindy K. Miller* argued the cause for respondent, Board of Public Utilities (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal focuses on an order of the Board of Public Utilities (Board) that directs solid waste utilities to provide the Board with customer lists. The Appellate Division affirmed the order, 205 *N.J.Super.* 390 (1985). We granted certification, 103 *N.J.* 488 (1986), and now modify and affirm the judgment of the Appellate Division.

I

Appellants, consisting of ninety-two individual solid waste utilities and their trade associations, challenge an April 1, 1985, Board order (the order), which revised an order issued on November 30, 1984. The November order had been issued

without a hearing and, at appellants' request, the Board conducted a hearing on March 20, 1985, following which it issued the order.

Both orders recited:

The Board has determined that all solid waste collectors doing business in the State of New Jersey must provide to the Board complete and detailed information about the individual customers being serviced by such collectors. The Legislature has delegated to the Board the statutory responsibility to insure that each customer receives the level and quality of solid waste collection service he is entitled to under the terms and conditions of the collector's approved tariff. *N.J.S.A.* 48:13A–7. In order to ensure safe, adequate and proper service to the residents and solid waste customers of the State of New Jersey, the Board requires detailed knowledge of the specific identities of all affected customers in the State of New Jersey.

Moreover, the Board has determined that the provision of up-to-date customer lists to the Board by each solid waste collector in the State of New Jersey will enable the Board to monitor and to assure that no person is monopolizing, attempting to monopolize or conspiring with other persons to monopolize the solid waste industry or charging rates which are unjustly discriminatory.

Repeating a substantially similar provision in the November order, the order directed:

Each and every solid waste utility subject to the regulatory authority of the Board of Public Utilities provide: a true list of all residential, commercial, industrial and institutional customers including the name and address of each customer, rates charged, rate schedule applied, the frequency and type of service supplied, including but not limited to container sizes for residential, commercial, industrial and institutional customers.

Failure to comply with the order could result in "revocation or suspension of the violating utility's Certificate of Public Convenience and Necessity and/or to fines or penalties as provided for in *N.J.S.A.* 48:13A–9 and *N.J.S.A.* 48:13A–12."

In response to notice from the Board, various solid waste utilities submitted written comments and attended the March hearing, at which the Board entertained argument of counsel and statements from representatives of various solid waste utilities. Thereafter, the Board issued the order, which required submission of customer lists by April 15, 1985, and stated that the lists would be unavailable for inspection or use by other solid waste collectors or the public. Implementation

of the order has been stayed, first by the Board and more recently by the Appellate Division.

Appellants contend that the order is invalid because the Board failed to comply with the requirements for either rule-making, *N.J.S.A.* 52:14B–4, or a contested case, *N.J.S.A.* 52:14B–9. Additionally, they contend that the Board did not have authority to issue the order and that the order requires the disclosure of confidential "trade secrets" and is, therefore, an unlawful "taking" of a property right.

## II

Before the enactment of the Solid Waste Utility Control Act of 1970 (the Act), *N.J.S.A.* 48:13A–1 to –13, the solid waste industry was "composed of numerous scavengers, serving overlapping territories * * * [and] fraught with the potential for abuse in the form of favoritism, rigged bids, official corruption, and the infiltration of organized crime." *In re Application of Saddle River*, 71 *N.J.* 14, 22 (1976). According to the State Commission of Investigation, which conducted an investigation and rendered a report that preceded the Act, "perhaps the greatest vice" was the allocation of customers and territories by scavengers. *A Report Relating to the Garbage Industry of New Jersey* (October 7, 1969) at 4, 6.

The Act was based upon a legislative finding that "efficient and reasonable solid waste collection, disposal and utilization service * * * will more likely be achieved if the Public Utility Commission is charged with the duty of setting and enforcing standards and rates for regulating economic aspects" of the service. *N.J.S.A.* 48:13A–2. Accordingly, the Act empowers the Board to designate franchise areas, *N.J.S.A.* 48:13A–5; issue certificates of public convenience and necessity, a condition precedent to engaging in the solid waste business, *N.J.S.A.* 48:13A–6; approve tariffs, *N.J.S.A.* 48:13A–6.1; regulate rates, *N.J.S.A.* 48:13A–4; monitor and, if necessary, adjust excessive rates and charges, *N.J.S.A.* 48:13A–7; require performance

bonds, *N.J.S.A.* 48:13A–8; and revoke or suspend certificates of public convenience, *N.J.S.A.* 48:13A–9. Additionally, the Act prohibits monopolies, *N.J.S.A.* 48:13A–10, and prescribes civil and criminal penalties for violations of the Act or any rule, regulation, or administrative order promulgated under the Act, *N.J.S.A.* 48:13A–12. Finally, and of special relevance to this appeal, the Act authorizes the Board to "compel the attendance of witnesses and the production of * * * contracts, books, accounts and all other documents necessary to enable the board to administer its duties as prescribed by law and this act." *N.J.S.A.* 48:13A–11.

The Act complements the Board's general powers over all public utilities, including those engaged in solid waste collection and disposal. *N.J.S.A.* 48:2–13. Those powers authorize the Board to fix just and reasonable rates and modify discriminatory rates, *N.J.S.A.* 48:2–21(b)1; "[i]nvestigate * * * any matter concerning any public utility," *N.J.S.A.* 48:2–19a; "inspect and examine all books, accounts, papers, records and memorandum kept by any public utility in respect of any matter within the board's jurisdiction and which would not be privileged in any judicial proceeding," *N.J.S.A.* 48:2–16.2; and compel a utility to compile from its books and records information relevant to any investigation undertaken by the Board, *N.J.S.A.* 48:2–36.1. The data that the Board may "require to be compiled may relate and extend to services rendered, business done, transactions had, and property located, within or without this state * * *." *Id.* Thus, the vast powers of the Board over public utilities in general were strengthened as to solid waste utilities. In particular, the Board's power to examine records and memoranda of other public utilities, which does not generally extend to privileged material, is not so restricted with respect to the records of solid waste utilities. *N.J.S.A.* 48:13A–11. Concerned as it was with "favoritism, rigged bids, and the infiltration of organized crime" in the solid waste industry, *In re application of Saddle River, supra,* 71 *N.J.* at 22, the Legislature apparently intended that a scavenger's records should not be privileged.

That factual and legislative background adds color to the general proposition that powers expressly granted to an administrative agency should be liberally construed so that the agency can fulfill the Legislature's purpose, *Barry v. Arrow Pontiac, Inc.*, 100 *N.J.* 57, 70 (1985), and that an agency's express authority is augmented by such incidental authority as may be reasonably necessary or appropriate to effectuate the expressly delegated authority, *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562 (1978). So viewed, we have no doubt that the Board was acting well within its legislative mission when it issued the order. The requested information was necessary for the exercise of the Board's authority to ensure efficient and reasonable solid waste collection and to prevent anti-competitive practices. That is so even though the order was not incident to a pending or contemplated investigation. The Act does not require the existence of such an investigation or inquiry for the Board to compel a utility to produce documents. *See N.J.S.A.* 48:13A–11; *cf. N.J.A.C.* 7:26–6.4 (regulation promulgated pursuant to the Act and the Solid Waste Management Act, *N.J.S.A.* 13:1E–1 to –176, requiring information concerning sources, transportation, and disposal of waste to be submitted on request to Department of Environmental Protection). Furthermore, the public interest requires the Board to prevent not only actual, but potential, anti-competitive practices, and the requested information was critical to the Board's identification of such practices.

Nor were appellants due any more process than that accorded by the Board prior to the issuance of the order. Before the Board and the Appellate Division, appellants contended that the matter involved a "contested case." At oral argument before us, however, they shifted their ground and argued that the Board actually engaged in rulemaking. In any event, the matter did not involve a "contested case," *N.J.S.A.* 52:14B–2(b), and, therefore, did not require that "all parties * * be afforded an opportunity for hearing after reasonable notice," *N.J.S.A.* 52:14B–9(a). As we have previously noted,

"[c]ontested cases are those in which the Constitution or a statute requires an adjudicatory hearing." *Texter v. Human Servs. Dep't,* 88 *N.J.* 376, 384 (1982). It is only when the proposed administrative action is based on disputed adjudicative facts that an evidentiary hearing is mandated. *Bally Mfg. Corp. v. N.J. Casino Control Comm'n,* 85 *N.J.* 325, 334, *appeal dismissed,* 454 *U.S.* 804, 102 *S.Ct.* 77, 70 *L.Ed.*2d 74 (1981). Here, the contest centers not on disputed facts, but on the Board's power to gather information in the exercise of its regulatory duties. Such information is the daily grist of the administrative mill, and the mere act of collecting that information does not constitute the institution of a "contested case." We conclude that the Board is not obliged to conduct an adjudicatory hearing before directing collectors to submit documents that are necessary for the Board to regulate the solid waste industry. *See N.J.S.A.* 48:13A–11.

We are likewise unpersuaded by appellants' argument that the order fails to satisfy the requirements for rulemaking under *N.J.S.A.* 52:14B–4. The Administrative Procedure Act defines a rule as "each agency statement of general applicability and continuing effect that implements or interprets the law or policy, or describes the organization, procedure or practice requirements of any agency." *N.J.S.A.* 52:14B–2(e). Recently, we suggested that an agency determination could be considered to be an administrative rule:

if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter, and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. [*Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 331–32 (1984).]

All six of the *Metromedia* factors need not be present to characterize agency action as rulemaking, and the factors should not be merely tabulated, but weighed. *See id.* at 332.

██ Here, appellants correctly point out that the order satisfies the first three factors. The order affects all scavengers, applies generally and uniformly to them, and operates prospectively. Nonetheless, it does not meet the remaining rulemaking tests. The order is a directive that is clearly inferable from the Act, *see N.J.S.A.* 48:13A–11 (authorizing the Board to require the production of documents), and it neither changes nor interprets Board policy concerning solid waste utilities. Viewed realistically, the issuance of the order is not so much an attempt to make a rule as it is one to obtain information that the Board needs to do its job.

As an alternative to acting formally through rulemaking or adjudication, administrative agencies may act informally. *Texter v. Human Servs. Dep't, supra,* 88 *N.J.* at 383–84 (citing Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy,* 78 *Harv.L.Rev.* 921, 923 (1965)); 1 K. Davis, *Administrative Law Treatise* § 1.4 at 13 (2d ed. 1978); *see also* Clagett, *Informal Action-Adjudication-Rule Making: Some Recent Developments in Federal Administrative Law,* 1971 *Duke L.J.* 51, 51 (1971) (all administrative decision-making involving the formulation of policy is either informal action, rulemaking, or formal adjudication). Although not discussed in judicial decisions or legal literature as often as formal action, informal action constitutes the bulk of the activity of most administrative agencies. 1 K. Davis, *Administrative Law Treatise, supra,* § 1.4 at 14; *see also* Shapiro, *The Choice of Rulemaking or Adjudication, supra,* at 924 (informal action is indispensible, widespread, and perhaps abused). The various kinds of action can overlap, and the line between agency rulemaking and adjudication, on the one hand, and informal action, on the other, can become blurred. Part of the problem is the difficulty of defining "informal action."

■■ A negative definition of "informal action" is that it is statutorily authorized agency action that is neither adjudication nor rulemaking. 1 K. Davis, *Administrative Law Treatise, supra,* § 1.4 at 13. More specifically, Professor Davis defines "informal action" as "any action (or determination in favor of inaction) that is taken without a trial-type hearing." *Id.* Denotatively defined, informal agency action includes investigating, publicizing, planning, and supervising a regulated industry. *Id.; see also* Shapiro, *The Choice of Rulemaking or Adjudication, supra,* at 923–24 (private ruling or advisory opinion, speeches, and press releases constitute informal agency action); 2 K. Davis, *Administrative Law Treatise, supra,* § 13.4 at 485–86 (informal action also includes negotiating, settling, contracting, and advising). Thus, under its powers to investigate or supervise the activities of a regulated industry, an agency may issue an informal administrative order requiring production of documents or information. *See, e.g., United States v. Morton Salt Co.,* 338 *U.S.* 632, 642–43, 70 *S.Ct.* 357, 364, 94 *L.Ed.* 401, 410–11 (1950) (holding that an agency vested by statute with investigative and accusatory duties may take steps, including issuance of an agency order compelling particular reports to show continuing compliance with a decree, to inform itself whether there is probable violation of law); *Utah Fuel Co. v. National Bituminous Coal Comm'n,* 306 *U.S.* 56, 59 *S.Ct.* 409, 83 *L.Ed.* 483 (1939) (upholding agency order requiring coal producers to file report showing detailed cost of tonnage produced and realization prices derived from sale).

■■ Normally courts defer to the procedure chosen by the agency in discharging its statutory duty. Subject to the strictures of due process and of the Administrative Procedure Act, an agency may choose how to proceed. Accordingly, it is within the agency's discretion "to select those procedures most appropriate to enable the agency to implement legislative policy." *Texter v. Human Servs. Dep't, supra,* 88 *N.J.* at 385; *accord Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 *U.S.* 519, 543, 98 *S.Ct.* 1197,

1211, 55 *L.Ed.*2d 460, 479 (1978) (administrative agencies should be free to pursue methods of inquiry permitting them to discharge their multitudinous duties) (citations omitted). By proceeding informally, the Board acted well within that discretion and in a manner that was responsive to its purpose and function in regulating solid waste utilities. *See Texter v. Human Servs. Dep't, supra,* 88 *N.J.* at 385–86.

In the absence of a statutory requirement, due process may still require some kind of hearing. *See* K. Davis, *1982 Supplement to Administrative Law Treatise* § 13:0 at 236 ("nearly all interests that are the subject matter of litigation deserve procedural protection to the extent of allowing informal response to the adverse allegations"); *see also* Friendly, *Some Kind of Hearing,* 123 *U.Pa.L.Rev.* 1267, 1278 ("required degree of procedural safeguards varies directly with the importance of the private interest affected and the need for and usefulness of the particular safeguard and the given circumstances and inversely with the burden and any other adverse consequences of affording it"). Generally, the amount of process that is due will depend on the private interest affected, the burden on the government in providing a hearing, and the adequacy of the procedure to evaluate the effect of the governmental action on the private interest. In determining whether a procedure satisfies the requirements of due process, a court should consider:

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [*Mathews v. Eldridge,* 424 *U.S.* 319, 335, 96 *S.Ct.* 893, 903, 47 *L.Ed.*2d 12, 33 (1976) (citation omitted).]

Due process does not always require an administrative agency to hold an evidentiary hearing before it goes about the business it was created to conduct. The power to supervise and investigate a regulated industry could be undermined if a regulator were required to provide the industry with the right

to produce witnesses and cross-examine staff members before the agency could act. *See In re Application of Waterfront Comm'n,* 32 *N.J.* 323, 334 (1960). Even when required, a hearing need not be tantamount to a trial. K. Davis, *1982 Supplement to Administrative Law Treatise, supra,* § 13:0 at 235. Sometimes nothing more is required than notice and the opportunity to present reasons, either orally or in writing, why the proposed action should not be taken. *See id.* (citing *Goss· v. Lopez,* 419 *U.S.* 565, 95 *S.Ct.* 729, 42 *L.Ed.*2d 725 (1975)). At other times, however, in addition to notice and the opportunity to be heard, due process may also require further procedural safeguards such as the opportunity to confront and cross-examine adverse witnesses, oral argument, presentation of evidence, and the right to retain an attorney. 2 K. Davis, *Administrative Law Treatise, supra,* § 10:6 at 326–27 (quoting *Goldberg v. Kelly,* 397 *U.S.* 254, 90 *S.Ct.* 1011, 25 *L.Ed.*2d 287 (1970)); *see Board of Educ. v. Cooperman,* A–45/46, slip op. at 17 (N.J. April 15, 1987).

In the present case, the interests at stake are appellants' rights to protect their customer lists from disclosure and the Board's need for disclosure of those lists to discharge its statutory duties. Because the proceeding did not involve any disputed facts, a full evidentiary hearing would have been unnecessary and burdensome, both fiscally and administratively, to the agency. By providing the appellants with the opportunity to submit comments in writing and to present oral argument through counsel, the Board granted appellants sufficient procedural· protection to satisfy the requirements of due process. *See Texter v. Human Servs. Dep't, supra,* 88 *N.J.* at 385–86.

## III

We turn now to appellants' contention that their customer lists were "trade secrets," that the order failed to

provide adequate safeguards to protect those secrets, and, therefore, that the order constituted an unlawful "taking" of a property right. In rejecting those contentions, we agree with the Appellate Division that the Board may compel disclosure of the customer lists, whether they constitute trade secrets or not, so long as the lists are sufficiently protected from public disclosure. 205 *N.J. Super.* at 397. That conclusion follows from a balancing of the regulator's need for information and the regulated industry's right to confidentiality. *In re Martin,* 90 *N.J.* 295, 318 (1982); *accord Ruckelshaus v. Monsanto Co.,* 467 *U.S.* 986, 1006, 104 *S.Ct.* 2862, 2874, 81 *L.Ed.*2d 815, 834 (1984) (among factors to be considered in determining whether a compensable taking has occurred are "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations") (citations omitted). In the past, we have similarly recognized that the legitimate public interest in certain information must be balanced with the competing right of privacy of the individuals possessing such information. *In re Martin, supra,* 90 *N.J.* at 318 (quoting *Lehrhaupt v. Flynn,* 140 *N.J.Super.* 250, 260, *aff'd o.b.,* 75 *N.J.* 459 (1978)). Under this balancing test, the agency's request for information will be sustained if it is rationally related to a legitimate governmental purpose and if confidentiality of the information, once produced, will be adequately safeguarded. *See In re Martin, supra,* 90 *N.J.* at 317–18; *accord Ruckelshaus v. Monsanto Co., supra,* 467 *U.S.* at 1006, 1009–10, 104 *S.Ct.* at 2874, 2876–77, 81 *L.Ed.*2d at 835, 837–38 (conditions under which the information is submitted to the government should be rationally related to a legitimate governmental interest; the government should protect a "reasonable investment-backed expectation" of confidentiality regarding the information).

In the present case, the compulsory production of the customer lists is rationally related to a legitimate governmental purpose. The lists are essential for the Board to regulate the economic aspects of and prevent anti-competitive practices in

the solid waste collection industry. With the customer lists, the Board can identify early signs of potential anti-competitive practices and, having identified those practices, it may regulate them, investigate potential abuses, or take other appropriate action.

In reaching that result, we note the concern of the Board commissioners, stated at the public hearing, with respect to the apparent persistence of untoward economic practices within the solid waste industry. For example, numerous solid waste utilities were recently convicted of knowingly engaging in a combination and conspiracy in restraint of trade contrary to *N.J.S.A.* 56:9–3. *State v. Scioscia,* 200 *N.J.Super.* 28 (App. Div.), certif. denied, 101 *N.J.* 277 (1985). The charges, which emanated from an unlawful agreement to allocate customers, *id.* at 32, are reminiscent of the conditions that gave rise to the Act. Given that state of affairs, we cannot fault the Board, as the agency entrusted with regulating the solid waste industry, for wanting to satisfy itself about the arrangements between collectors and their customers.

We do not view the customer lists as constituting information that is so confidential that appellants should not be obliged to disclose it to the Board. *See In re Martin, supra,* 90 *N.J.* at 316. The lists are not such personal or sensitive information as to preclude the Board from compelling their submission. Whatever property interests appellants may have in the lists are outweighed by the Board's duty to enforce the Act. The Board's virtually unlimited power to compel production of documents under the Act is consistent with the legislative intent to eliminate anti-competitive practices in the solid waste industry. In light of the legislative goal, we would be remiss in foreclosing the Board from the customer lists for the asserted reason that those lists were protected trade secrets.

Even so, we recognize that the lists are of value to appellants, and that the Board should provide adequate safeguards against public disclosure. *See In re Martin, supra,* 90 *N.J.* at

322. To this extent, we disagree with the Appellate Division, which perceived "absolutely no reason" to provide such safeguards. 205 *N.J.Super.* at 397. The Board itself recognized the confidential nature of the lists by providing in the order that "these lists will not be available for inspection or use by other collectors or the public as such public inspection is unnecessary to the Board's purposes in requiring the lists." Before us, the Board has agreed to place the lists in a locked safe, to limit access to such employees as are engaged in the investigation of the solid waste industry, and to require board employees to sign an appropriate record when they obtain access to the lists. We trust that the Board will give appropriate consideration to other suggestions appellants might proffer to maintain the confidentiality of the lists.

We reach that conclusion notwithstanding the absence of support in the record to find that appellants had a "reasonable investment-backed expectation" that the Board would maintain the lists in confidence. *See Ruckelshaus v. Monsanto Co., supra,* 467 *U.S.* at 1006, 1009–10, 104 *S.Ct.* at 2874, 2876–77, 81 *L.Ed.*2d at 834, 837–39. When a regulated industry has such an expectation in maintaining the confidentiality of information provided to a regulator, disclosure of that information could constitute an unlawful taking. *See id.* In *Ruckelshaus,* the Supreme Court found that such an expectation arose from the 1972 amendments to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), which prohibited the Environmental Protection Agency from disclosing trade secrets submitted to it by applicants for registration. According to the Court, disclosure by EPA of such secrets would constitute an unlawful taking. By contrast, the Act contains no such provision and does not create a "reasonable investment-backed expectation" that the Board would maintain the customer lists in confidence. *See Ruckelshaus v. Monsanto Co., supra,* 467 *U.S.* at 1006, 104 *S.Ct.* at 2874, 81 *L.Ed.*2d at 836–37.

Nonetheless, the power to compel disclosure of information should be limited to disclosure to the Board. *See In re Martin, supra,* 90 *N.J.* at 320. The power of the regulator to obtain information in the public interest should not be subverted by competitors into a means of obtaining otherwise unavailable information for their private gain.

Like the Appellate Division, 205 *N.J.Super.* at 397, we reject appellants' argument that the customer lists, once filed, should constitute "public records" subject to public scrutiny. The lists are not "records which are required by law to be made, maintained, or kept on file by any board * * *." *N.J. S.A.* 47:1A–2. In this regard, the order was merely an administrative directive, and not the equivalent of either a statute or a Board regulation. *See Irval Realty v. Board of Pub. Util. Comm'rs,* 61 *N.J.* 366, 375 (1972). The lists are not the written memorial of a public officer authorized to make them, *McClain v. College Hosp.,* 99 *N.J.* 346, 354 (1985), and therefore not subject to disclosure as public records. Also, the interest of anyone seeking the disclosure is unlikely to outweigh the interests of the public and the industry in keeping the records confidential. *See Nero v. Hyland,* 76 *N.J.* 213, 222–27 (1978).

The judgment of the Appellate Division is affirmed as modified.

*For modification and affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal* —None.