**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3672-14T3

IN RE: PRELIMINARY CONTRACT
FINANCIAL SETTLEMENTS ON THE
CENTER FOR FAMILY SUPPORT'S
CONTRACTS WITH THE DIVISION OF
DEVELOPMENTAL DISABILITIES,
CONTRACT NOS. 01ZX10N and 01ZX11N

_____

Argued July 6, 2017 — Decided July 20, 2017

Before Judges Yannotti and Haas.

On appeal from the Department of Human
Services, Division of Developmental
Disabilities.

Dennis F. Driscoll argued the cause for
appellant The Center for Family Support NJ,
Inc. (Inglesino, Webster, Wyciskala & Taylor,
LLC, attorneys; John P. Inglesino and Lisa D.
Taylor, of counsel and on the brief; Owen T.
Weaver, on the briefs).

Francesco Ferrantelli, Jr., Deputy Attorney
General, argued the cause for respondent
Department of Human Services, Division of
Developmental Disabilities (Christopher S.
Porrino, Attorney General, attorney; Beth
Leigh Mitchell, Assistant Attorney General, of
counsel; John Regina, Deputy Attorney General,
on the brief).

PER CURIAM

Appellant The Center For Family Support NJ, Inc. (the Center) appeals from the March 6, 2015 decision of respondent Division of Developmental Disabilities (the Division) requiring the Center to repay the Division $883,631 in funds it allegedly misspent under two contracts appellant entered into with the Division for the two-year period between July 1, 2009 and June 30, 2011. On appeal, the Center contends that the Division is prohibited from recovering these funds because the Division should have promulgated the contract terms that the Center violated as administrative regulations under the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15. Having reviewed the record in light of the Center's arguments and the applicable law, we affirm.

We derive the following facts from the record presented on appeal. The Division "[p]rovides services for eligible developmentally disabled persons by identifying appropriate programs to meet their needs" and by contracting with those programs to provide services to these individuals. N.J.S.A. 30:6D-27(a). Pursuant to this statutory authority, the Division has contracted with the Center since 1997 to provide services to Division clients.

During this period, the Center and the Division signed a "Standard Language Document for Social Service and Training Contracts" (SLD), developed by the Department of Human Services

(the Department).  The SLD incorporates the standard terms and conditions of the contract, and a new SLD is executed each fiscal year that a provider agrees to provide services to Division clients.

The SLD defines a contract as "this document [the SLD], the Annex(es), any additional appendices or attachments (including any approved assignments, subcontracts or modifications) and all supporting documents."  The SLD further states that the "[c]ontract constitutes the entire agreement between the parties."

With particular relevance to the present appeal, Section 3.11 of the SLD states:

> In the administration of this [c]ontract, the Provider Agency shall comply with all applicable policies and procedures issued by the Department including, but not limited to, the policies and procedures contained in the Department's Contract Reimbursement Manual (as from time to time amended) and the Department's Contract Policy and Information Manual [(CPIM)] (as from time to time amended).  Failure to comply with these policies and procedures shall be grounds to terminate the contract.

The CPIM is a compendium of policy circulars that are incorporated by reference into each Division contract.  Among other things, these circulars cover such standard and decidedly mundane contract terms and conditions as the documents a provider must provide to the Division in connection with the contract

negotiation (Policy Circular P1.01); what happens if the provider merges with or acquires another company (Policy Circular P1.09); terms applicable to the closeout of a contract (Policy Circular P7.01); the procedures the provider and the Division will follow in the event of an audit (Policy Circular P7.06); and the minimum amount of insurance a provider must have in place (Policy Circular P8.14).

In this appeal, the Center challenges the inclusion of Policy Circular P1.10 in its contract with the Division.  This circular governs the procedures a provider must follow in order to modify the contract during the fiscal year.  The circular states that a modification must be approved by the Division in advance of any "[c]hange in any [b]udget [c]ategory which exceeds the [f]lexible [l]imits" of the contract.[1]  The provider must also seek the Division's prior written approval before it "[t]ransfer[s] [any] budgeted cost across DHS [c]ontracts, or [c]lusters as identified in the [c]ontract."[2]

---

[1] The term "budget category" means "one of the major groupings of cost identified in the Contract Budget Annex B Form."  The term "flexible limits" refers to the "upper dollar limit which is established for each [b]udget [c]ategory, and which may not be exceeded without an approved [c]ontract [m]odification."

[2] The term "cluster" means "one or more service-related [p]rograms . . . identified in the [c]ontract."

Thus, for example, if the provider has agreed in the contract that it will spend a specified amount for a particular service during the contract year, it may not exceed that amount without first obtaining a written contract modification approved by the Division. In addition, the provider may not transfer funds from other budget categories to cover cost overruns in a different budget category unless it has obtained prior Division approval.

These routine contract provisions as set forth in the circular have been included, in one form or another, in each contract the Center has entered into with the Division since at least 2002. The circular specifically states that the provider's "[f]ailure to complete a required [c]ontract [m]odification to the [Division] may result[,]" among other things, in "[c]ontract [d]efault [and] "[r]ecoupment of [f]unds" by the Division.

The Center entered into provider contracts with the Division subject to the above terms for State fiscal years (FY) 2010 and 2011. Prior to the execution of these agreements, the Division reminded the Center in writing that if it "request[ed] a contract modification to shift funds between clusters, the modification must be approved prior to implementation[,]" and that "[a]ny expenditure incurred prior to approval will be disallowed" in accordance with the terms of the CPIM.

Subsequent audits of the Center's FY 2010 and FY 2011 contracts revealed that the Center exceeded its budget for particular line items and "reallocated funds" from other budget categories and clusters "to meet pressing needs" in connection with those line items. The Center conceded that it did not obtain prior Division approval for these expenditures.

In accordance with the express terms of the Center's contract, the Division sent a letter to the Center on February 22, 2012 demanding the return of $507,961 in misspent funds for FY 2010, and a second letter on October 31, 2014, seeking an additional $375,670 covering the Center's improper expenditures for FY 2011. The Center balked at repaying these funds and alleged, among other things, that the Division should have promulgated the contract terms as administrative regulations, the Division waived its right to seek recoupment of the contract funds, and that the Division's claims were barred by the doctrines of equitable estoppel and laches.

After settlement attempts failed, the Division sent a letter to the Center on March 6, 2015, again demanding the return of $883,631 in contract funds. The Center responded by filing a notice of appeal from the March 6, 2015 decision to this court. In response, the Division filed a motion to dismiss the appeal and transfer it to the Law Division. While that motion was pending,

the Center sent written notice to the Division that it would be filing a breach of contract claim against the agency under the Contractual Liability Act, N.J.S.A. 59:13-1 to -10. On August 27, 2015, the Center filed its complaint against the Division in the Law Division.[3]

Thereafter, the parties participated in a case management conference conducted under the auspices of our Civil Appeals Settlement Program. As a result of that conference, we ordered that the Center's present appeal could "proceed, limited solely to the issue of whether the implementation of [the Division's] policy violates the" APA. We further ordered that the question of whether the Division "properly applied" its policy as set forth in the CPIM, "and all other issues and defenses," would be adjudicated in the Law Division action, which we stayed pending the resolution of this appeal.

On appeal, the Center contends that the Division's "adoption of Policy Circular P1.10 violated the" APA; constituted an "administrative rule"; and was "invalid because [the Division] failed to adhere to the procedures of the" APA. Thus, the Center contends that the requirements for contract modification set forth

---

[3] Docket No. L-007739-15.

in the circular, and made a part of its contract with the Division, are invalid.  We disagree.

Agencies are accorded "wide latitude in improvising appropriate procedures to effectuate their regulatory jurisdiction."  <u>Metromedia, Inc. v. Dir., Div. of Taxation</u>, 97 <u>N.J.</u> 313, 333 (1984).  "Administrative agencies possess the ability to be flexible and responsive to changing conditions[,]" which "includes the ability to select those procedures most appropriate to enable the agency to implement legislative policy."  <u>In re PSE&G Co. Rate Unbundling</u>, 167 <u>N.J.</u> 377, 385 (2001) (internal quotation marks and citation omitted).

Thus, in exercising its discretion when discharging its statutory duties, an agency may choose between formal action, such as rulemaking or adjudication, or informal action, provided the choice complies with due process requirements and the APA.  <u>Nw. Covenant Med. Ctr. v. Fishman</u>, 167 <u>N.J.</u> 123, 135 (2001) (citing <u>In re Request for Solid Waste Util. Customer Lists</u>, 106 <u>N.J.</u> 508, 518 (1987)).  Informal agency action constitutes the bulk of the activity of most administrative agencies, and it has been defined as any determination that is taken without a trial-type hearing. <u>In re Solid Waste</u>, <u>supra</u>, 106 <u>N.J.</u> at 519.

Significantly, the Supreme Court has further defined informal agency action as "statutorily authorized agency action" such as

"investigating, publicizing, planning, and supervising a regulated industry." Ibid. The term also includes "negotiating, settling, contracting, and advising" within the scope of its statutory authority. Ibid. (emphasis added). Thus, when an agency contracts with a private entity, it engages in "informal agency action" and is not required to promulgate an administrative regulation in order to do so.

Although administrative "agencies 'have wide latitude in improvising appropriate procedures to effectuate their regulatory jurisdiction[,]' . . . this discretion is not unbounded." Deborah Heart & Lung Ctr. v. Howard, 404 N.J. Super. 491, 504 (App. Div.) (quoting Metromedia, supra, 97 N.J. at 333-34), certif. denied, 199 N.J. 129 (2009). Thus, an agency's informal action may constitute de facto rulemaking, despite the label the agency gives to it. "In order to avoid abuse" by an agency of its "broad administrative powers, our Supreme Court enumerated six factors that are weighed to determine whether agency action must be designated as an administrative rulemaking requiring implementation through the APA." E.B. v. Div. of Med. Assistance and Health Servs., 431 N.J. Super. 183, 207 (App. Div. 2013) (citing Metromedia, supra, 97 N.J. at 331-32).

In Metromedia, the Court stated:

[A]n agency determination must be considered an administrative rule . . . if it appears that agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[Metromedia, supra, 97 N.J. at 331-32.]

These factors, "either singly or in combination," determine whether agency action amounts to the promulgation of an administrative rule. Id. at 332. A de facto rule will be held invalid unless the agency complied with the rulemaking requirements of the APA. Id. at 328.

Viewed against this background and applying the Metromedia standards, we are satisfied that the Division did not engage in prohibited de facto rulemaking when it contracted with the Center to provide services under the terms and conditions set forth in

10

the CPIM. As noted above, the Division is statutorily authorized to contract with private entities, such as the Center, in order to provide services to its clients. N.J.S.A. 30:6D-27(a). The contract modification terms that the Center now challenges were specifically incorporated into the parties' written annual contract, which expressly delineated each party's duties and obligations. The fact that the Division included a requirement that the Center obtain advance agency approval before spending beyond the limits of its approved budget in any category or cluster in the contract is exactly the type of "informal action" by an agency that the Supreme Court has held does not require rulemaking. In re Solid Waste, supra, 108 N.J. at 519; see also Nw. Covenant Med. Ctr., supra, 167 N.J. at 135.

Moreover, the contract modification provisions set forth in Policy Circular P1.10 and included in the CPIM and the SLD between the Division and the Center also do not meet the Metromedia criteria for a rule. The first two criteria are not met because the Division is not "regulating" the Center or the general public by making this circular part of the contract. Metromedia, 98 N.J. at 331. Rather, it has simply included standard contract modification requirements in the parties' agreement. The Center, like any other private service provider, is not required to contract with the Division for any purpose.

The third Metromedia criterion is also not met because the contract modification provisions in the circular are not designed to operate in future cases. Ibid. Instead, they apply to the particular contract entered into by the Division and a service provider for a specific one-year period. Because the Division is statutorily authorized to contract with service providers, which necessarily includes the authority to set contract terms, the circular does not "prescribe[] a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization." Ibid. Thus, the fourth Metromedia criterion is also inapplicable.

The fifth and sixth criteria are also not present. The contract modification provisions set forth in the circular have been part of the Division's contracts since at least 2002 and, therefore, do not reflect a "material and significant change" from past contract provisions. Ibid. Finally, these provisions do not constitute a "decision on administrative regulatory policy in the nature of the interpretation of law or general policy." Id. at 331-32. As stated above, they are simply several of the dozens, if not hundreds, of typical contract provisions included in any well-drafted State agency contract.

In sum, we conclude that the Division was not required to comply with the APA's rulemaking requirements when it decided to

include the contract modification provisions set forth in Policy Circular P1.10 in the contracts it entered into with the Center. With the resolution of this issue, the parties may now proceed with their pending Law Division action and, therefore, we vacate our previously-ordered stay of that proceeding.

Affirmed, and remanded for further proceedings in the Law Division. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3672-14T3