676 A.2d 1133

IN THE MATTER OF THE APPLICATION OF NEW JERSEY BELL
TELEPHONE COMPANY (NOW BELL ATLANTIC–NEW JER-
SEY, INC.) FOR APPROVAL OF ITS PLAN FOR AN ALTERNA-
TIVE FORM OF REGULATION.

Superior Court of New Jersey
Appellate Division

Argued October 24, 1995—Decided June 13, 1996.

78

80

Before Judges DREIER, KESTIN and CUFF.

*Menasha J. Tausner,* Deputy Public Advocate, argued the cause for appellant Division of the Ratepayer Advocate (*Blossom A. Peretz,* Director, attorney; *Frances I. Sundheim,* Acting Director, of counsel; *Robin J. Portnoi,* Deputy Public Advocate, on the brief).

*Francis R. Perkins* argued the cause for appellant New Jersey Cable Television Association (*Meyner and Landis,* attorneys; *Mr. Perkins, Raymond E. Makul,* and *Kathryn S. Koles,* on the brief).

*James C. Meyer* argued the cause for cross-appellant AT & T Communications of New Jersey (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Mr. Meyer,* on the letter brief).

*James H. Laskey* argued the cause for respondent MCI Telecommunications Corp. (*Norris, McLaughlin & Marcus,* attorneys; *Mr. Laskey,* on the letter brief).

*John A. Hoffman* argued the cause for respondent/cross-respondent New Jersey Bell (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Hoffman, Anne S. Babineau, Hesser G. McBride,* of counsel, and, with *Leslie A. Vial* and *Robert D. Mulvee,* on the brief).

*Elise Goldblatt,* Deputy Attorney General, argued the cause for the Board of Regulatory Commissioners (*Deborah T. Poritz,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Goldblatt,* on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

In the Telecommunications Act of 1992 (the Act), *N.J.S.A.* 48:2–21.16 to –21.21, the Legislature found and declared, *inter alia,* that

(1) In a competitive marketplace, traditional utility regulation is not necessary to protect the public interest and that competition will promote efficiency, reduce regulatory delay, and foster productivity and innovation.

\* \* \*

(5) It is in the public interest to relieve interexchange telecommunications carriers [1] from traditional utility regulation.

[*N.J.S.A.* 48:2–21.16b (footnote added).]

---

[1] " 'Interexchange telecommunications carrier' means a carrier, other than a local exchange telecommunications company, authorized by the board to provide long-distance telecommunications services." *N.J.S.A.* 48:2–21.17.

Accordingly, the Legislature conferred upon the Board of Regulatory Commissioners (the Board)

> the authority to approve alternative forms of regulation in order to address changes in technology and the structure of the telecommunications industry; to modify the regulation of competitive services; and to promote economic development.
>
> [*N.J.S.A.* 48:2–21.16a(5).]

The Board is empowered to approve a plan for an alternative form of regulation if it finds that the plan

(1) will ensure the affordability of protected telephone services;

(2) will produce just and reasonable rates for telecommunications services;

(3) will not unduly or unreasonably prejudice or disadvantage a customer class or providers of competitive services;

(4) will reduce regulatory delay and costs;

(5) is in the public interest;

(6) will enhance economic development in the State while maintaining affordable rates;

(7) contains a comprehensive program of service quality standards, with procedures for board monitoring and review; and

(8) specifically identifies the benefits to be derived from the alternative form of regulation.

[*N.J.S.A.* 48:2–21.18a.]

Several months after the January 17, 1992 effective date of the Act, New Jersey Bell Telephone Company, now Bell Atlantic–New Jersey (petitioner), filed a petition for approval of a new system of regulation. Pursuant to *N.J.S.A.* 52:14F–8b, the Board heard the matter directly, and on an accelerated schedule. It approved a modified plan in a decision and order dated May 6, 1993. Further modifications were approved at a June 11 meeting and confirmed in an order entered on July 23, 1993. The Division of Rate Counsel, now the Division of Ratepayer Advocate (Rate Counsel), and the New Jersey Cable Television Association (NJCTA) filed separate appeals from the Board's decision, which we consolidated. AT & T Communications of New Jersey, Inc. (AT & T/NJ) filed a cross-appeal. MCI Telecommunications Corporation (MCI), having been accorded the status of intervenor before the Board, is a nominal respondent.

Rate Counsel and NJCTA argue that the Board's determinations finding the approved plan to provide for just and reasonable rates and to meet statutory criteria were not supported by substantial credible evidence in the record. NJCTA also argues that the Board's approval of the plan before completion of the current regulatory regime (specifically, a rate stability plan experiment) was arbitrary; and, further, that the appearance of bias required the Board, in the circumstances, to refer the matter to the Office of Administrative Law for a hearing as a contested case, pursuant to the Administrative Procedure Act, *N.J.S.A.* 52:14B–9 and –10. The arguments of AT & T/NJ and MCI are, in one respect, variations on a common theme: that the plan as approved violated the Act in that the determinations to delete the plan's "attribution" safeguard and not to lower access rates rendered inadequate the plan's provisions for preventing discrimination against competitors. MCI, additionally, echoes Rate Counsel's argument that the Board failed in its duty to determine that petitioner's rates, especially its access rates, were currently just and reasonable.

The issues before us place in question the adequacy and permissibility under prevailing law of petitioner's modified plan as approved by the Board (the plan). There is no dispute, however, as to the elements of the approved plan as outlined in the Board's decision and orders of May 6 and July 23, 1993.

Intended to be effective until December 31, 1999, the plan provides for the replacement of traditional rate-base/rate-of-return regulation with an alternative system designed to provide petitioner with economic incentives and the wherewithal to apply advanced technologies to its communications system so as to achieve a state-of-the-art telecommunications network at the earliest possible time. Most particularly, petitioner seeks through the plan to accelerate completion of a fiber optic telecommunications network it refers to as "Opportunity New Jersey".

In general under the plan, in keeping with the design of the Act, petitioner's non-competitive protected telephone services [2] are to be regulated differently, and more intensely especially with regard to rates, than its competitive services.[3] In respect of the latter, the Board may not "regulate, fix or prescribe the rates, tolls, charges, rate structures, terms and conditions of service, rate base, rate of return, and cost of service[.]" *N.J.S.A.* 48:2–21.19a. Among its other features and details, the plan makes specific provision for

- Board regulation of increases in tariffed rates for rate regulated services, including maintenance of rates for some;
- review and approval of rate structures and restructures;
- monitoring of rates of return (including distributions of excessive returns on equity), rate restructuring, and depreciation rates and methods;
- regulating the provision of intraLATA [4] services;

---

[2] " 'Protected telephone services' means any of the following telecommunications services provided by a local exchange telecommunications company, unless the board determines, after notice and hearing, that any of these services is competitive *or should no longer be a protected telephone service*: telecommunications services provided to business or residential customers for the purpose of completing local calls; touch-tone service or similar service; access services other than those services that the board has previously found to be competitive; toll service provided by a local exchange telecommunications company; and the ordering, installation and restoration of these services." *N.J.S.A.* 48:2–21.17.

[3] " 'Competitive service' means any telecommunications service determined by the board to be competitive prior to the effective date of this act or determined to be competitive pursuant to sections 4 or 5 of this act [*N.J.S.A.* 48:2–21.19, –21.20], or any telecommunications service not regulated by the board." *N.J.S.A.* 48:2–21.17. See also *N.J.S.A.* 48:2–21.19, which provides, *inter alia*,
> b. The board is authorized to determine, after notice and hearing, whether a telecommunications service is a competitive service. In making such a determination, the board shall develop standards of competitive service which, at a minimum, shall include evidence of ease of market entry; presence of other competitors; and the availability of like or substitute services in the relevant geographic area.

[4] " 'LATA' means Local Access Transport Area as defined by the board in conformance with applicable federal law." *N.J.S.A.* 48:2–21.17. In the 1982 settlement of the federal government's antitrust suit against the then-integrated AT & T corporation, *United States v. AT & T*, 552 *F.Supp.* 131 (D.D.C.1982), *aff'd sub. nom., Maryland v. United States*, 460 *U.S.* 1001, 103 *S.Ct.* 1240, 75 *L.Ed.*2d 472 (1983), "local access and transport areas" (LATAs) were designated as those

- establishing standards and procedures for defining and identifying competitive and non-competitive services, and governing their relationship, including criteria and means for unbundling them where appropriate, see *N.J.S.A.* 48:2–21.19(e)(1), with an express requirement that the rates charged for petitioner's "own competitive service shall exceed the rates charged to others for the non-competitive services on which the competitive service depends", see *N.J.S.A.* 48:2–21.19(e)(2);
- general systems of continuing oversight and review by the Board with particular reference to preventing cross-subsidization of competitive services by rate regulated services; and
- methods for properly reattributing revenues from access charges paid by interexchange telecommunications carriers insofar as they have been attributed to the cost of local exchange or other non-competitive services.

In keeping with the tenor of the Act and its more recently enacted federal counterpart, the Telecommunications Act of 1996, *Pub.L.* No. 104–104, 110 *Stat.* 56, the plan bespeaks a comprehensive change in both essence and effect in the field of public utility regulation. Providing glosses on the issues on appeal, the primary concerns of each of the parties challenging the plan have been succinctly outlined in the respective briefs.

██ Rate Counsel has taken the position that petitioner's preplan rates (the "going-in rates") were themselves higher than warranted and could not be considered just and reasonable. Consequently, it is argued, the plan's continuation of existing rates in exchange for accelerating $1.5 billion in construction related expenditures, cannot be considered to conform with the statutory mandates that the plan "produce just and reasonable rates for telecommunication services",[5] *N.J.S.A.* 48:2–21.18a(2). Rate

---

exchange areas within which a "Bell operating company", such as petitioner, was the local telephone service provider. *Petition of MCI Telecommunications Corp.*, 263 *N.J.Super.* 313, 316–17, 622 *A.2d* 1314 (App.Div.1993); H.R.REP. No. 104–204, 104th Cong., 2d Sess. 49 (1995). *See also* the federal Telecommunications Act of 1996, *Pub.L.* No. 104–104, § 3(a)(2)(35) and (43), 110 *Stat.* 58–59 (1996). And see *N.J.S.A.* 48:2–21.17 which uses the term "local exchange telecommunications company" to describe entities such as petitioner.

5 " 'Telecommunications service' means any telecommunications service which is subject to regulation by the board pursuant to Title 48 of the Revised Statutes." *N.J.S.A.* 48:2–21.17.

Counsel has also argued that petitioner failed to establish that the plan would "not unduly or unreasonably prejudice or disadvantage a customer class or providers of competitive services", *N.J.S.A.* 48:2–21.18a(3).

The basis of NJCTA's arguments has been that petitioner's capacity "to provide non-telephone services in potential competition with the members of the NJCTA", an important goal of the plan, will be achieved by "cross-subsidization, on the backs of telephone ratepayers," in violation of the statutory prohibition against using "revenues earned or expenses incurred in conjunction with non-competitive services to subsidize competitive services", *N.J.S.A.* 48:2–21.18c. NJCTA contends that it "does not oppose the development of such capacity by others in the telecommunications industry, as long as those entities are not in a position to compete unfairly with NJCTA members by virtue of a privileged position in the marketplace." The gravamen of the argument is that the variety of ways, direct and indirect, in which cross-subsidization can be accomplished by a company as large and pervasively engaged as petitioner, assures that it will occur as the plan is effected.

The argument advanced by AT & T/NJ focuses upon an "attribution safeguard", initially included in petitioner's plan proposal at the behest of long distance carriers, and deleted by the Board in its decision approving a modified plan. The attribution safeguard was designed to level the ground between petitioner and its competitors in the cost of using access connections owned by petitioner for competitive services. It was based on the recognition that petitioner functioned both competitively and non-competitively, and could, if given a free hand, abuse its monopoly position in certain connections to disadvantage its competitors in other pursuits. It would have required petitioner to charge itself the same as it charged its competitors for use of the access connections. The attribution safeguard was intended to assure compliance with the statutory provisions requiring that the plan "not unduly or unreasonably prejudice or disadvantage ... providers of

competitive services", *N.J.S.A.* 48:2–21.18a(3), and prohibiting the use of "revenues earned or expenses incurred in conjunction with non-competitive services to subsidize competitive services", *N.J.S.A.* 48:2–21.18c. *See also N.J.S.A.* 48:2–21.19(e)(4). The attribution safeguard was characterized by petitioner in discovery as "a competitive safeguard for interexchange carriers", established to address possible future action adjusting rates for non-competitive service and using the level of subsidy provided by access charges to set non-competitive rates. The Board deleted the attribution safeguard on the basis of its staff's argument that it was premature to address the issue of attribution in this proceeding and that the subject should be separately considered in a proceeding regarding intraLATA competition. AT & T/NJ contends that the Board's action in this regard was contrary to uncontested evidence in the record, and should be overturned, with the attribution safeguard reinstated to the plan.

MCI's argument has elements of the issues raised by both Rate Counsel and AT & T/NJ, focusing on the cost to interexchange telecommunications carriers of access to petitioner's system. MCI contends that the Board abused its discretion and failed to effect underlying policies of the Act when it chose to rely on its 1985 findings in determining that petitioner's current rates are just and reasonable, thereby failing to take adequately into account falling costs in the telecommunications industry and other more current data.

Our review of the extensive record in the light of the arguments advanced by the parties discloses that the Board's action approving, in modified form, the plan proposed by petitioner was a proper exercise of the regulatory discretion committed to the Board's authority in the Act and other enabling legislation. We discern the Board's action to have been a fair implementation of the new regulatory regime embodied in the Act. The Board, in its decision, addressed each of the approval criteria recited in *N.J.S.A.* 48:2–21.18a, and concluded, with ample basis in the evidence, that all had been satisfied.

■ Additionally, the Board explained without reference to traditional methodology how it found current rates to be reasonable and how the plan ensured that rates would remain reasonable. The Board clearly articulated, *inter alia*, that it considered petitioner's rates to be just and reasonable because they were the lowest in the nation and could never rise in any year by more than half of the inflation rate. These determinations were exercises of administrative judgment which, if supported by substantial evidence in the record, we may not properly reject. *Golden Nugget Atlantic City Corp. v. Atlantic City Elec. Co.*, 229 *N.J.Super.* 118, 126, 550 *A.*2d 1267 (App.Div.1988).

■ Indeed, there was ample evidence on all sides of every issue considered by the Board. The scope of our inquiry on review is, therefore, limited. *In re Jersey Central Power & Light Co.*, 85 *N.J.* 520, 526–27, 428 *A.*2d 498 (1981). We are not at liberty to titrate the evidence in order to determine whether we would have made the same findings and reached the same conclusions as the Board did on the record before it. *In re Recycling & Salvage Corp.*, 246 *N.J.Super.* 79, 87, 586 *A.*2d 1300 (App.Div. 1991). Rather, where there is substantial evidence on all sides of the issues addressed, no findings made or conclusions reached that are based on that evidence and are otherwise within the Board's discretionary authority will be seen to be arbitrary, capricious or unreasonable. *Cf. In re County of Bergen*, 268 *N.J.Super.* 403, 411, 633 *A.*2d 1017 (App.Div.1993).

■ We are, furthermore, bound to recognize and respect the Board's substantive expertise, especially on questions that are "primarily of judgmental or predictive nature", *FCC v. National Citizens Comm. for Broadcasting*, 436 *U.S.* 775, 813, 98 *S.Ct.* 2096, 2121, 56 *L.Ed.*2d 697, 726 (1978); *Golden Nugget Atlantic City Corp. v. Atlantic City Elec. Co., supra*, 229 *N.J.Super.* at 126, 550 *A.*2d 1267; *New Jersey Bell Tel. Co. v. Dep't of Public Util.*, 162 *N.J.Super.* 60, 77, 392 *A.*2d 216 (App.Div.1978). One such example is the Board's choice of productivity offset; apparently, the

first one approved for a local exchange telecommunications company in New Jersey.

■ Some of the arguments advanced before the Board, and on appeal, go to the heart of the Legislature's purpose in adopting the Act, and to its underlying design of establishing alternatives to traditional modes of utility regulation. Absent constitutional considerations, which are not present here, these are not positions we can fittingly address. They are matters of public policy within the domain of the political branches of government. *See Duquesne Light Co. v. Barasch,* 488 *U.S.* 299, 310, 109 *S.Ct.* 609, 617, 102 *L.Ed.*2d 646, 659 (1989); *cf. In re Solid Waste Util. Customer Lists,* 106 *N.J.* 508, 519–20, 524 *A.*2d 386 (1987).

The Board was not required to conduct a rate-base/rate-of-return analysis in order to determine whether rates under the plan were just and reasonable. The Board's view of its authority in this regard was soundly consonant with manifest legislative intendment. The Legislature specifically stated that by "alternative form of regulation" it meant

> a form of regulation of telecommunications services other than traditional rate base, rate of return regulation to be determined by the board and may include, but not be limited to, the use of an index, formula, price caps, or zone of rate freedom. [*N.J.S.A.* 48:2–21.17.]

To be sure, the Legislature has expressly committed to assuring the reasonableness of rates in general and the affordability of rates for protected telephone services in particular. *See, e.g., N.J.S.A.* 48:2–21.16a(1), (2); –21.18a(1), (2), (3). Yet, we would sponsor a contradiction in terms, were we to hold, as Rate Counsel and NJCTA urge, that the beginning point of determining the reasonableness of rates under a plan for an alternative form of regulation must be by some form of rate-base/rate-of-return evaluation, methods no longer required by the Act. No provision of the Act creates such an exceptional requirement.

Although rate-base/rate-of-return analysis has, in the past, been seen as a required method for avoiding confiscatory rates, *i.e.,* protecting utilities against unconstitutional regulation, *see, e.g.,*

*Knoxville v. Knoxville Water Co.*, 212 *U.S.* 1, 29 *S.Ct.* 148, 53 *L.Ed.* 371 (1909), and its progeny, there are no parallel constitutional considerations when, in regulating for the public interest, a legislature determines that other methods should be employed, and the public utilities affected make no showing that they have been harmed unduly in the economic sense by overreaching regulation. *See Duquesne Light Co. v. Barasch, supra*, 488 *U.S.* at 316, 109 *S.Ct.* at 620, 102 *L.Ed.*2d at 662; *Permian Basin Area Rate Cases*, 390 *U.S.* 747, 800, 88 *S.Ct.* 1344, 1377, 20 *L.Ed.*2d 312, 355 (1968) ("[W]e see no objection to [the Commission's] use of a variety of regulatory methods. Provided only that they do not together produce arbitrary or unreasonable consequences, the Commission may employ any 'formula or combination of formulas' it wishes and is free 'to make the pragmatic adjustments which may be called for by particular circumstances.'"). In such an instance, we address matters of legislative policy unimpacted by issues of constitutional entitlement. The Board's continuing authority and responsibility to effect basic, underlying policies of the current statutory scheme, along with the review mechanisms provided in the plan, are permissible and workable safeguards for assuring that rates will continue to be just and reasonable as envisioned by the Legislature. *See Mobil Oil Corp. v. Federal Power Comm'n*, 417 *U.S.* 283, 320–21, 94 *S.Ct.* 2328, 2351–52, 41 *L.Ed.*2d 72, 102 (1974); *Wisconsin v. Federal Power Comm'n*, 373 *U.S.* 294, 309, 83 *S.Ct.* 1266, 1274–75, 10 *L.Ed.*2d 357, 368 (1963).

Any proposal as comprehensive as the plan will be vulnerable to attack in any number of its specific details. Nevertheless, no party has persuasively established that any putative flaw in the plan as approved by the Board is so fundamental a deficiency as to require invalidation of the entire conception or, even, a modification of any element. We take as well within the Board's authority and administrative discretion its determination that, on balance, the plan was an approvable formulation. *See Federal Power Comm'n v. Hope Natural Gas Co.*, 320 *U.S.* 591, 602–03, 64 *S.Ct.* 281, 287–88, 88 *L.Ed.* 333, 344–45 (1944); *In re Jersey Central Power & Light Co., supra*, 85 *N.J.* at 526–27, 428 *A.2d* 498. We

need not address at any length the particular flaws isolated by appellants. With due regard for the Board's expertise, we are satisfied that there was ample basis in the record to support each element of the plan as approved. *Golden Nugget Atlantic City Corp. v. Atlantic City Elec. Co., supra,* 229 *N.J.Super.* at 122–23, 550 *A.2d* 1267.

Arguments are advanced attacking particular aspects of the Board-approved modified plan as lacking adequate evidential support. Our examination of the record leads us to conclude that the Board, in examining and ultimately approving the plan in modified form, acted reasonably within its discretionary powers in evaluating the evidence before it: accepting some, rejecting some, and, generally, weighing and sifting the data and expert opinions that were submitted. *E.g., Renan Realty Corp. v. Dep't of Community Affairs,* 182 *N.J.Super.* 415, 421, 442 *A.2d* 614 (App.Div.1981).

NJCTA argues in this regard that to the extent the Board relied on the testimony of petitioner's expert, Dr. Francis J. Cronin, and the report of his economic consulting firm on the relationship between telecommunication investment and economic growth on which significant aspects of Cronin's testimony was based, it did so in contravention of the *N.J.R.E.* 705 requirement that "the underlying facts or data" upon which an expert's opinion is based be subject to disclosure on cross-examination. The genesis of this argument is in certain non-disclosure provisions required by the Board which were designed to protect, to the greatest extent possible consonant with the Board's own evidentiary needs, the expert's proprietary interests in processes used to analyze data. NJCTA's argument in this regard fails to make adequate particularized connection between asserted evidentiary deficiencies in the Board's decision and gaps in the processes that were disclosed by Cronin. An administrative agency, like a court, must have the authority to issue orders protective of trade secrets and other confidential matter belonging to parties or witnesses. *See Dixon v. Rutgers, The State University of N.J.,* 110 *N.J.* 432, 435, 541 *A.2d* 1046 (1988); *In re Solid Waste Util. Customer Lists,*

*supra,* 106 *N.J.* at 523–24, 524 *A.*2d 386. An application of such authority will be upheld as long as the scope of the protection afforded does not demonstrably deprive any party of a fair opportunity to address factual showings and opinions that come to inform the ultimate decision made. No adequate showing has been made in this regard by any party.

NJCTA also argues that because the Board was not required by the Act to adopt an alternative form of regulation, it acted arbitrarily by considering the proposed plan without the benefit of knowledge to be gained from a previously approved, experimental rate stability plan (RSP). The RSP had been proposed by petitioner in 1987 as a six-year experiment during the course of which certain services designated as "competitive" would not be subject to "earnings surveillance". The experiment was designed to expire on June 30, 1993.

We find no basis in law for this argument. The Act itself cannot be fairly construed to require the maintenance of any previously approved plan as a prerequisite for effectuating any proposal pursuant to the new regulatory regime. In the absence of any such requirement, we can only conclude that the matter was left to the regulatory judgment of the Board. It could have chosen to await the receipt of data from the RSP before embarking on new regulatory avenues. It was also free to implement the new policies authorized by the Legislature without delay, terminating any ongoing regulatory programs in the process. The Board's action in making the latter choice may well have frustrated the expectations of those in competition with petitioner, but it denied no legally protected property or procedural interest in doing so. At bottom, the decision whether to continue or terminate the RSP was one of policy and regulatory discretion which the Board was empowered to make; it was not a matter calling for the kind of evidentiary development commonly required in the quasi-judicial context. *See High Horizons Dev. Co. v. Dep't of Transp.,* 120 *N.J.* 40, 50–51, 575 *A.*2d 1360 (1990); *cf. Cunning-*

*ham v. Dep't of Civil Service*, 69 *N.J.* 13, 20–21, 350 *A.*2d 58 (1975).

We are also unpersuaded by the arguments of MCI and AT & T/NJ that the plan unduly prejudices petitioner's competitors. The major premise of MCI's argument is that the Board lacked the authority to set or confirm competitor access rates without reference to "what would have resulted under traditional regulation", *i.e.*, rate-base/rate-of-return methods. We find no such intendment in the Act. To the contrary, as we have already observed, the Act specifically permits traditional rate-base/rate-of-return to be supplanted by alternative modes of regulation on the expressed premise that "[p]ermitting the competitive interexchange telecommunications marketplace to operate without traditional utility regulation will produce a wider selection of services at competitive market-based prices[ ]", *N.J.S.A.* 48:2–21.16b(3). It is equally clear that it is the Board's responsibility to insulate the providers of competitive services from undue or unreasonable prejudice or disadvantage, *N.J.S.A.* 48:2–21.18a(3); *see also N.J.S.A.* 48:2–21.19e(2), (4), but that protection may be achieved within the new regulatory structures authorized by the Act, not by requiring superimposition of old methods which are no longer mandatory.

The Board found that it was not compelled to reduce competitor access rates to cost, because promoting universal basic service through subsidies from such access rates and other services was more important:

> The Board has considered but rejects MCI's argument that the rate/cost relationship with respect to access charges has become distorted since switching costs have been declining over time and that therefore access charges must be reduced before the commencement of the plan. Were the Board to reduce every service rate that is above cost, there would be no subsidy from any service to basic exchange service and universal service would be jeopardized. The Board has historically priced basic residential service on a residual basis, that is, after a revenue requirement has been quantified, rates have been increased for all services other than basic to the extent possible, and then basic has been increased as a last resort. This is a policy that has created affordable rates (in fact among the lowest in the nation) and universal service. This Board policy and the accomplishments derived from it would be eliminated if all services were priced precisely at cost.

This was a policy decision within the discretionary authority of the Board as conferred by the Legislature. It bespeaks a reasoned conclusion, by definition free of arbitrariness or caprice, and is therefore entitled to deference. *Cf. Dougherty v. Dep't of Human Services*, 91 *N.J.* 1, 6, 449 *A.*2d 1235 (1982); *Texter v. Dep't of Human Servs.*, 88 *N.J.* 376, 382, 443 *A.*2d 178 (1982); *Alevras v. Delanoy*, 245 *N.J.Super.* 32, 35–36, 583 *A.*2d 778 (App.Div.1990), *certif. denied*, 126 *N.J.* 330, 598 *A.*2d 888 (1991).

We also regard as well within the Board's discretion, its decision that consideration of petitioner's proposed attribution safeguard would be more suitable in a separate proceeding on intraLATA competition. AT & T/NJ argues that the Board could not validly refuse to approve the attribution safeguard in the absence of any evidence countervailing its wisdom or appropriateness. We question the underlying premise of the argument to the extent it suggests excessive limitations on an administrative agency's authority to reach a decision on policy or procedural grounds as distinguished from evidential grounds. *Township of Cedar Grove v. Sheridan*, 209 *N.J.Super.*, 267, 275, 507 *A.*2d 304 (App. Div.), *certif. denied*, 104 *N.J.* 464, 517 *A.*2d 448 (1986). We have been given no reason to question the Board's judgment that the subject of attribution safeguards is more logically treated as part of the larger subject of intraLATA competition or can be dealt with more comprehensively in that context. AT & T/NJ has also not shown that it has any right, based on the Act or any other source of entitlement, to consideration of attribution as a specific safeguard against competitive disadvantage, *i.e.*, that without attribution, contradistinguished from other protective features of the plan, such as the imputation provision which the Board regarded as adequate, AT & T/NJ and others similarly situated would be at so great a competitive disadvantage as to contravene the statutory standard contained in *N.J.S.A.* 48:2–21.18a(3).

The remaining issue on appeal, raised by NJCTA, embodies two related questions that arise from the conduct of Board Chair Salmon in actively supporting the bill that became the

Telecommunications Act of 1992 and his conduct, possibly along with another member or members of the Board, in attending a presentation on petitioner's "Opportunity New Jersey" at a meeting of a public utilities trade association in June 1992. The first question is whether the conduct of Commissioner Salmon or other members of the Board so tainted their consideration of this matter with the appearance of bias as to require a reversal of the Board's decision approving a modified plan. The second is whether the solution to the problem of taint advanced by some of the parties at the prehearing stage, to transfer the matter to the Office of Administrative Law for handling as a contested case, *N.J.S.A.* 52:14B–10(c), (d), would have been an effective resolution of any such problem that may have existed, and should not have been denied by the Board.

The "taint" alleged here is a far cry from that which we found to exist in *In re Bergen County Util. Auth.*, 230 *N.J.Super.* 411, 553 *A.*2d 849 (App.Div.1989). We held that disqualification was required there because a member of the Board had or appeared to have a personal or pecuniary interest in the outcome of a pending matter which might influence his judgment. *Id.* at 419–20, 553 *A.*2d 849. We held the fact that the individual involved was under consideration for appointment as executive director of a petitioning utility "could reasonably be interpreted as having the likely capacity to tempt [him] to avoid a decision contrary to [the utility's] interests." *Id.* at 420, 553 *A.*2d 849.

None of the actions attributed to Commissioner Salmon or his colleagues were of the type that suggested a bias on the merits of petitioner's application for approval of its plan, requiring disqualification from ruling on the matter, *see In re the Private Passenger & Utility Automobile Rates of Allstate Ins. Co.,* 161 *N.J.Super.* 564, 572–73, 392 *A.*2d 163 (App.Div.1978), as distinguished from their commitment to the underlying policies of the new legislation, which could not be seen as a reason to disqualify them. The conduct of a member of an administrative board in supporting or opposing proposed legislation cannot, in the absence

of some particularized showing, be taken as equivalent to a bias on the outcome of any proceeding pursuant to that legislation. *See* II Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise*, § 9.8 at 68 (3d ed. 1994). Nor is disqualification required by reason of mere attendance at an open industry meeting in which elements of a proposal are discussed. I Davis & Pierce, *supra*, § 8.4 at 391 ("It would be absurdly inefficient and counterproductive to forbid an agency charged with responsibility to regulate an industry to engage in informal communications concerning the basic characteristics of the industry and its product or of the broad implications of a billion dollar ... project.") In each instance, given the special separation of function standards applying to administrative agencies, *see* II Davis & Pierce, *supra*, § 9.9, the official is performing a policy role or discharging administrative duties of the position which are taken, in a general sense, not to preclude participation in an administrative adjudication. *Kramer v. Board of Adjustment, Sea Girt,* 45 *N.J.* 268, 281, 212 *A.*2d 153 (1965).

Turning to the related issue, if there had been a disqualifying conflict or showing of bias, simple transmittal to the Office of Administrative Law for handling as a contested case would not have cured it. Under the Administrative Procedure Act, even if an administrative law judge had presided over the hearing, final decision-making authority would have continued to reside in the Board. *N.J.S.A.* 52:14B–10(c), :14F–7a; *see* II Davis & Pierce, *supra*, § 9.9 at 97. If the Board's involvement was tainted by reason of particularized bias or interest, actual or potential, the only effective remedy would be to disqualify the Board, or certain members of it, from any participation in the decision-making process altogether. *See Kramer, supra,* 45 *N.J.* at 278–83, 212 *A.*2d 153; *In re Bergen County Util. Auth., supra,* 230 *N.J.Super.* at 420, 553 *A.*2d 849; *In re Allstate Ins. Co., supra,* 161 *N.J.Super.* at 573–75, 392 *A.*2d 163. No adequate showing has been made in this matter that would justify so drastic a remedy, and no party actually argues that it would have been appropriate. The

one suggestion that was made for curing the perceived problem, transmission to the Office of Administrative Law for hearing as a contested case, was, simply, unsuited for the purpose.

Affirmed.