984 A.2d 437 (2009)
411 N.J. Super. 69
In the Matter of the PROVISION OF BASIC GENERATION SERVICE FOR the PERIOD BEGINNING JUNE 1, 2008.
No. A-3200-07T3.
Superior Court of New Jersey, Appellate Division.
Argued October 6, 2009.
Decided November 25, 2009.
*439 Stefanie A. Brand, Public Advocate Rate Counsel, argued the cause for appellant Public Advocate (Ronald K. Chen, Public Advocate, attorney; Ami Morita, Deputy Rate Counsel, Kurt S. Lewandowski, Assistant Deputy Rate Counsel, and Diane Schulze, Assistant Deputy Public Advocate, on the brief).
Babette Tenzer, Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (Anne Milgram, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Tenzer, on the brief).
Gregory Eisenstark, Assistant Corporate Rate Counsel, argued the cause for respondents Public Service Electric & Gas Company and PSEG Energy Resources & Trace, LLC.
James H. Laskey, Bridgewater, argued the cause for respondent Independent Energy Producers of NJ (Norris, McLaughlin & Marcus, attorneys; Mr. Laskey, on the joint brief).
Andrew Muscato (Skadden, Arps, Slate, Meagher & Flom), New York City, argued the cause for respondent JP Morgan Ventures Energy Corp.
Morgan, Lewis & Bockius, New York City, for respondent Jersey Central Power & Light Company (Marc B. Lasky, on the joint brief).
Riker, Danzig, Scherer, Hyland & Perretti, Morristown, for respondent Consolidated Edison Energy (James C. Meyer, on the joint brief).
Nicholas W. Mattia, Jr., Montvale (Dickstein Shapiro, Los Angeles, CA), for respondent Conectiv Energy Supply Company.
Bevan, Mosca, Giuditta & Zarillo, for respondents Constellation Energy Commodities Group and Constellation New Energy, Inc. (Murray E. Bevan, on the joint brief).
Before Judges CARCHMAN, PARRILLO and ASHRAFI.
The opinion of the court was delivered by
CARCHMAN, P.J.A.D.
Appellant Department of the Public Advocate, Division of Rate Counsel (Rate Counsel), is the statutorily designated representative of the State's utility ratepayers. *440 N.J.S.A. 52:27EE-49. Rate Counsel appeals from a portion of the New Jersey Board of Public Utilities' (BPU or the Board) January 25, 2008 order (the Order), approving the pass-through to utility ratepayers of a portion of the costs of solar renewable energy certificates (SRECs). Rate Counsel challenges the Order on both constitutional and procedural grounds and also asserts that the BPU's decision was arbitrary and capricious. We reject these arguments and affirm.
To place the issues in context, we briefly present an overview of the legislative underpinnings of the dispute as well as the relevant facts related to the issues before us. In 1999, the New Jersey Legislature enacted the Electric Discount and Energy Competition Act (EDECA), N.J.S.A. 48:3-49 to -98.1. In re Ownership of Renewable Energy Certificates, 389 N.J.Super. 481, 487, 913 A.2d 825 (App.Div.2007). The BPU is the agency charged with regulating the manner in which energy is supplied and upholding the goal of EDECA, which is to ensure the provision of safe, adequate and proper services at reasonable prices. N.J.S.A. 48:3-50c.
Under EDECA, electricity consumers have the option of obtaining electricity from alternative energy suppliers, defined as "electric power suppliers." N.J.S.A. 48:3-51. Customers who do not choose this alternative option receive a "default" service, defined in EDECA as a basic generation service (BGS), which is provided by electric distribution companies (EDCs). N.J.S.A. 48:3-57. EDCs do not generate their own electricity but rather obtain it from suppliers involved in a competitive bidding process at annual auctions held by the BPU. The winning bidders then enter into Supplier Master Agreements (SMAs) with the EDCs to supply a set amount of electricity during the applicable contract period.
Providers who sell to residential and small business BGS customers bid for three-year contracts supplying one-third of the total required electric load. Since these auctions are held annually, one-third of the total electrical load is replaced each year, one-third of the load is under a two-year contract and one-third is under a one-year contract.
In addition, EDECA mandates the BPU to adopt Renewable Portfolio Standards, which, in essence, require utilities to annually increase their reliance on renewable energy, N.J.S.A. 48:3-87d, here, solar power. Pursuant to BPU regulations, suppliers are required to ensure a certain percentage of the electricity they supply is derived from solar power. These required percentages are called renewable energy portfolio standards (RPS). N.J.S.A. 48:3-87d. Under these regulations, SRECs can be used to assist in meeting the RPS. N.J.A.C. 14:8-2.8. If a supplier does not hold enough SRECs to comply with the regulations, it can meet its requirements by purchasing higher priced Solar Alternative Compliance Payments (SACP). N.J.A.C. 14:8-2.3(e) and N.J.A.C. 14:8-2.10. Previously, the SACP level was set at $300 per megawatt-hour (MWH).
The BPU issued a January 19, 2007 order directing "the Office of Clean Energy to conduct a public stakeholder process to solicit comments" on various solar power issues, including whether the SACP levels should be maintained at $300 per MWH. Interested parties submitted comments, reports and various proposals. One such comment, submitted by joint respondent[1] Jersey Central Power & *441 Light Company[2] (JCP & L), "requested that current BGS auction contract holders not be held to paying solar costs higher than those which existed at the time when the auction contracts were established." During a September 12, 2007 public agenda meeting, the BPU announced its decision regarding changes to RPS regulations, which was subsequently memorialized in an order dated December 6, 2007. In relevant part, the Board established a new eight-year SACP schedule with different levels for each year. Effective for the June 1, 2008 to May 31, 2009 reporting year, the SACP level was set to $711. Effective in the reporting year beginning on June 1, 2009 to May 31, 2010, the SACP level was set to $693. The Board did not address JCP & L's suggestion that these raised levels do not apply to 2006 and 2007 auction contract holders, who had made their bids when the SACP level was $300.
On June 22, 2007, the Board directed the EDCs to file proposals for procuring BGS supply for the energy year beginning on June 1, 2008. It also directed the EDCs to file comments to a Final Report made by the Boston Pacific Company, Inc., BPU's auction consultant, which "provided recommendations for changes to be considered by the EDCs, stakeholders and the Board through the BCG proceedings process in an attempt to improve future BGS Auctions." It further directed the parties to follow an attached procedural schedule, setting forth all the filing deadlines, and directed interested parties to "file discovery and comments with the Board's Secretary and circulate them electronically through the electric list server used by [the Board] Staff. . . ."
Pursuant to the Board's schedule, on July 2, 2007, the EDCs filed a joint proposal for BGS requirements addressing the specific issues set forth in the Board's June 22, 2007 order. Additional comments were filed on August 24, 2007, by Rate Counsel and three other EDCs. On September 20, 2007, the Board held a "legislative type" hearing where various EDC, Rate Counsel and other interested parties "presented comments for the record, and were questioned by the Commissioners and Board staff." On September 24, 25, 26 and 27, 2007, the BPU also held public hearings at various locations to solicit comments.
Final comments were filed on or about September 28, 2007. Allegedly, Independent Energy Producers of New Jersey (IEPNJ), a "trade association for the power generation industry in New Jersey," at some unspecified time, sent an e-mail to BPU Staff, indicating it planned to file comments, but "notif[ied them] that the comments would be a little late. . . ." On September 30, 2007, the IEPNJ e-mailed its comments to Frank Perrotti, a BPU staff member, commenting that it "could not get the list server to work for [IEPNJ]." IEPNJ admits that contrary to the Board's June 22, 2007 order, it did not file a paper copy with the Secretary of the Board. Although PSE & G claims that IEPNJ's comments were "available from the list server," Rate Counsel states that it did not receive these comments "until well after the Board's [November 8, 2007] agenda meeting."
One of IEPNJ's comments responded to the Board's September 12, 2007 decision *442 (memorialized in the December 6, 2007 order) to increase the SACP levels beginning June 1, 2008. IEPNJ commented that because the Board "significantly increased future SACP levels, [it] should protect winners of tranches[3] in previous auctions from this increase. . . ." It reasoned that the 2006 and 2007 auction winners should "be insulated . . . because this increase results from a regulatory action that was wholly unanticipated and not predictable at the time of those previously held auctions." Therefore, it suggested two alternatives: 1) "grandfathering those tranches at the previous SACP level of $300/MWH"; or 2) "allow the BGS suppliers to pass through those costs for solar supply, or SACP payments, above the previously expected level of $300." The IEPNJ argued that these options "would maintain confidence in the BGS process and not leave suppliers facing the possibility of paying for regulatory charges that were not known at the time of their bids" since "providing regulatory consistency is a key factor in maintaining confidence in the auction and will result in lower auction prices than would otherwise occur."
PSE & G also submitted a comment on September 30, 2007 regarding the Board's September 12, 2007 order increasing the SACP rates. PSE & G's proposal echoed IEPNJ's first suggestion: that the Board "grandfather" the existing tranches and keep them at the $300 level. PSE & G made the same argument that a failure to do so "would possibly have the effect of undermining confidence in the BGS auction process and raising the bids in upcoming auction as bidders include a risk premium for lack of regulatory certainty."
On November 8, 2007, the Board held an agenda meeting where Perrotti presented various issues, comments and recommendations as directed by the Board's June 22, 2007 order. The Board also discussed the issue that had been raised by IEPNJ and PSE & G, regarding the SACP increases. Perrotti presented the suppliers' concerns regarding the 2006 and 2007 auction winners. He stated that "[s]taff estimates that the SACP could lead to an aggregate increase in costs up to $50 million for the two BGS auctions . . ." The "[s]uppliers [were] seeking to have those prior contracts grandparented so that the ratepayers, rather than suppliers, will bear the additional cost associated with the SREC price above [$]300." Perrotti noted, "[i]n theory the suppliers [were] on notice that the SACP should be changed since the BPU's current regulation[s] provide for the Board to reevaluate the SACP at least annually; however, requiring the suppliers to bear this cost, could discourage them from participating in future auctions." Therefore, he recommended "passing through to ratepayers the cost of the SRECs above $300" per MWH for the 2006 and 2007 contracts which would expire in 2010 at the latest.
The Board president questioned Perrotti as to the reasons behind his recommendation. Perrotti noted the prior change in SACP rates from $300 to $711 but did not specify whether it applied to existing contracts. The following dialogue ensued:
MR. PERROTTI:
. . . .
We are just strictly erring on the side all rightand I will clarify thatwe're just strictly erring on the side that a regulatory uncertainty that, you know, they were led to believe this was the *443 case prior to those auctions and now it's changed.
As pointed out in the discussion and in consultation with [another BPU Staff member], I think these suppliers knew in the rules that they very well could have seen an increase in the level.
COMMISSIONER [JOSEPH] FIORDALISO: I think by grandfathering it in 
PRESIDENT [JEANNE] FOX: You could vote that.
COMMISSIONER FIORDALISO:  you're being fair and I think that's the bottom line.
MR. PERROTTI: Because otherwise we could have very easily went the other way and just said you need to absorb these costs. It's a risk and you should have maybe foreseen that risk.
PRESIDENT FOX: And I think it is a fairness thing.
Persuaded by this reasoning, the Board then approved all of the Staff's recommendations. On January 25, 2008, the Board issued a decision and order memorializing its November 8, 2007 decision. As to the SACP, the Board recited the relevant facts, and noted that "[t]he suppliers are seeking to have those prior contracts `grandparented', so that the ratepayers, rather than the suppliers, would bear any additional costs associated with SREC prices above $300." It then found:
While the suppliers were on notice that the SACP could change, since the BPU's current regulations provide for the Board to re-evaluate the SACP at least annually, the Board is concerned that requiring the suppliers to bear this cost could discourage them for participating in future Auctions, including the upcoming Auction. Therefore, subject to the conditions as described below, the Board APPROVES the pass through to ratepayers of the cost of SRECs above the $300 megawatt-hour for (1) June 1, 2008 through May 31, 2009 for the BGS contracts covering June 1, 2006 through May 31, 2009; and (2) June 1, 2008 through May 31, 2010 for the BGS contracts covering June 1, 2007 through May 31, 2010.
The Board then directed the EDCs to "submit to the Board for approval . . . a proposed rate recovery mechanism, including a method for demonstrating that any incremental costs were reasonably and prudently incurred, which process will provide for an opportunity to be heard by Rate Counsel and other parties."[4] The Board also directed the EDCs to "provide documentation justifying recovery. . . ."
On March 10, 2008, Rate Counsel filed a notice of appeal, limited to the Board's decision to pass through the SACP increase to the ratepayers. On appeal, Rate Counsel asserts that the Board's action should be reversed because: 1) it violates the contract clause of the Constitutions of the United States and New Jersey, U.S. Const. art. I, § 10, cl. 1; N.J. Const., art. IV, § 7, ¶ 3; 2) it violates statutorily granted rights to notice of a hearing; 3) it violates its procedural due process rights; and 4) it is arbitrary and capricious and not based on credible evidence in the record. We address the issues seriatim.
Rate Counsel argues that the Board's decision to allow a pass through of the increased rates to ratepayers is an unconstitutional impairment of the contract clause of both the Constitutions of the United States and New Jersey.
*444 The contract clause prohibit State action that "impair[s] the obligation of contracts." U.S. Const. art. I, § 10, cl. 1; N.J. Const., art. IV, § 7, ¶ 3. However, the prohibition contained in the contract clause is not absolute. "The contract clause does not deprive the states of their power to adopt general regulatory measures even if those regulatory measures result in the impairment or destruction of private contracts." In re PSE & G Co.'s Rate Unbundling, Stranded Costs and Restructuring Filings, 330 N.J.Super. 65, 93, 748 A.2d 1161 (App.Div.2000) (internal quotations omitted), aff'd, 167 N.J. 377, 395, 771 A.2d 1163, cert. denied, 534 U.S. 813, 122 S.Ct. 37, 151 L.Ed.2d 11 (2001). In order to determine whether a State action is an unconstitutional impairment of contracts, we apply a three prong test: the state action "(1) must substantially impair a contractual relationship; (2) must lack a significant and legitimate public purpose; and (3) must be based upon unreasonable conditions and be unrelated to appropriate governmental objectives." Hand v. Philadelphia Ins. Co., 408 N.J.Super. 124, 142, 973 A.2d 973 (App.Div.2009) (internal quotations omitted).
Rate Counsel argues that the Board's decision substantially impaired the ratepayer's contractual rights under the SMAs, as third party beneficiaries, since the rate increase was significant, which "burdened ratepayers with the additional costs associated with the SACP increase[,]" and "ratepayers had no reasonable expectation that the Board would effectively alter the terms of the SMA." The Board counters that the decision did not alter or modify the SMAs since the SMAs provided for such rate increases. It further argues there was no reasonable reliance on the terms of the SMA, and Rate counsel cannot quantify any adverse financial impact to ratepayers. Joint respondents also argue that the SMAs "do not guarantee retail BGS customers a rate that is identical to the price bid at the auction" because BGS is a regulated service and rates are subject to regulatory increases without prior notice.
"In determining whether a contract impairment is substantial, courts consider whether the industry has been regulated in the past[,]" which puts the contracting party on notice that the contract is subject to changes in regulation. In re PSE & G, supra, 330 N.J.Super. at 93, 748 A.2d 1161. "[C]ourts may also consider whether one of the parties reasonably relied on the contractual terms and whether the legislation was an unexpected modification of those terms." Ibid. In In re PSE & G, we held that the BPU's decision deregulating the electric industry did not substantially impair the appellant's contract because the appellant "knew that its contractual rights were subject to alteration by state legislation. Thus, [the appellant could not] have reasonably relied on the immutability of the agreement." Id. at 97, 748 A.2d 1161.
Here, possible modification of the SMA was expressly reserved by the enabling document. In fact, paragraph 12.1 of the SMA states, "[t]he Company and the BGS-Fp Supplier are subject to, and shall comply with, all existing or future applicable federal, State and local laws, all existing or future duly promulgated order or other duly-authorized actions of PJM or of Applicable Legal Authorities." The Board's decision to pass through the increased cost of the RPS due the change in SACP levels was a regulatory decision made as part of its duties under EDECA. N.J.S.A. § 48:3-57e (stating that "[e]ach electric public utility or electric power supplier. . . shall be permitted to recover in its basic generation charges on a full and timely basis all reasonable and prudently *445 incurred costs incurred in the provision of basic generation services").
While the SMAs do not address the issue of which party is responsible for bearing the cost of RPS compliance, Rate Counsel asserts that the SMAs provide that the suppliers are responsible for the cost of compliance with the RPS. However, the SMAs state that suppliers are responsible for "coopera[ting] with the Company in any regulatory compliance efforts that may be required to maintain the ongoing legitimacy and enforceability of the terms of [the SMA] and to fulfill any regulatory reporting requirement. . . ." This language mandates the suppliers' cooperation with regulatory requirements, not responsibility for the cost of RPS. The Board's decision did not alter the terms of the SMAs.
Even if the Board's decision modified the SMAs, the ratepayers could not have reasonably relied on "the immutability" of the SMAs since ratepayers were aware that the electric industry is regulated and subject to legislative change. Rate Counsel concedes that SMAs "are standardized contracts unique to the BGS procurement process . . . which were approved in form by the Board specifically for use in procuring BGS power." Further, as previously noted, the SMAs contain no express terms addressing the burden of increased regulatory costs. The terms of the SMAs provide no basis for ratepayer reliance. As joint respondents argue, the rate pass-through was a decision made by the BPU, "pursuant to its authority to implement BGS and the RPS."
Rate Counsel also argues that the Board's action lacked a significant and legitimate public purpose because the Board's reasoning that its decision would keep bidder's confidence was "specious at best" and "cannot be said to have a significant and legitimate public purpose." The Board and joint respondents both argue that promoting lower electricity prices for customers, through bidder's confidence, is a significant and legitimate public purpose.
With regard to "the second and third prongs of the test, the legitimacy and reasonableness of legislation, the courts generally defer to legislative judgment, unless the State itself is a contracting party." In re PSE & G, supra, 330 N.J.Super. at 94, 748 A.2d 1161. "If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation[.]" Energy Reserves Group v. Kan. Power & Light Co., 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569, 581 (1983).
We conclude that Rate Counsel's argument here is without merit. Rate Counsel focuses on the impact of the Board's decision rather than the purported public purpose. However, the second prong analysis requires focusing on whether the reason offered for the State action is a significant and legitimate public purpose, not whether the action achieved the purported public purpose. The Board premised its action on the objective of promoting lower electricity prices by maintaining bidders' confidence through the stability of the auctions. This is a legitimate public purpose specifically recognized by EDECA. In fact, N.J.S.A. 48:3-50a2 states in pertinent part, "[t]he Legislature finds and declares that it is the policy of this State to: (2) Place greater reliance on competitive markets, where such markets exist, to deliver energy services to consumers in greater variety and at lower cost than traditional, bundled public utility service[.]"
Rate Counsel's next argument also focuses on the impact of the BPU's actions. Rate Counsel asserts that the Board's action fails the third prong because its action *446 did not "ensure that more suppliers will participate in future BGS-FP auctions" and it did not provide the ratepayers with lower electricity costs since the costs associated with RPS compliance were passed onto them. The Board and joint respondents counter that the Board's action was reasonable in light of the context in which it was made; and further, that it was reasonably related to the considered public purpose.
The third prong of the analysis determines "whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." Energy Reserves Group, supra, 459 U.S. at 412, 103 S.Ct. at 705, 74 L.Ed.2d at 581 (internal quotations omitted). Under this prong, unless the State is a party to the contract, we defer to legislative judgment in determining the reasonableness of its actions. In re PSE & G, supra, 330 N.J.Super. at 94, 748 A.2d 1161.
Considering this deferential standard, we cannot conclude that the Board's actions were unreasonable. The Board made its decision in the context of a sudden increase in SACP levels from $300 to $711, which was unanticipated by the auction bidders. While the Board noted that the bidders were technically put on notice, it also acknowledged that it created some "regulatory uncertainty" since suppliers "were led to believe [$300] was the case prior to [the 2006 and 2007] auctions [but it has now] changed." We consider it reasonable to believe that if bidders face regulatory uncertainty, where prices may spike without prior notice, the bidders would take that increased risk into consideration when making their bids. Ultimately, that would increase the overall price that ratepayers would pay. By permitting the suppliers to pass on the increased cost to the ratepayers, the risk of regulatory uncertainty is no longer a factor that must be considered while bidding. The Board's decision need not be the soundest or most effective; that is not the standard. The standard is reasonableness, a standard that the Board does meet.
We therefore conclude that the Rate Counsel has not established that there is an unconstitutional impairment of contracts or a constitutional impediment to the actions taken by the BPU.
We now address Rate Counsel's procedural arguments.
Rate Counsel argues that the Board's decision to pass through to taxpayers the increased costs was a rate increase made without notice and without hearing, in violation of the EDECA hearing requirements, N.J.S.A. 48:2-21(d) and N.J.S.A. 48:2-32.4, and the New Jersey Administrative Procedures Act (APA), N.J.S.A. 52:14B-1 to -25. The Board and joint respondents argue in response that Rate Counsel received proper notice, and that the rate increase did not require a hearing. They also argue that the increase to $711 was well-known to Rate Counsel through participation in other relevant matters before the BPU. We agree.
EDECA mandates that "[n]o order shall be set aside in whole or in part for any irregularity or informality in the proceedings of the board unless the irregularity or informality tends to defeat or impair the substantial right or interest of the appellant." N.J.S.A. 48:2-46. The APA holds that parties in a "contested case . . . shall be afforded an opportunity for hearing after reasonable notice[,] . . . to respond, appear and present evidence and argument on all issues involved." N.J.S.A. 52:14B-9.c. Further, "[f]indings of fact shall be based exclusively on the evidence and on matters officially noticed." *447 N.J.S.A. § 2:14B-9f. A "contested case" is defined as
a proceeding . . . in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing. . . .
[N.J.S.A. 52:14B-2b.]
The APA "does not create a substantive right to an administrative hearing. The act merely prescribes the procedure to be followed in the event an administrative hearing is otherwise required by statutory law or constitutional mandate." Application of Modern Indus. Waste Serv., Inc., 153 N.J.Super. 232, 237, 379 A.2d 476 (App.Div.1977).
Rate Counsel argues that it is entitled to an evidentiary hearing under the APA because the Board's decision constituted a rate increase, which requires the Board to hold a "hearing, upon notice" before determining rates. N.J.S.A. 48:2-21.[5] Joint respondents cite In re Jersey Central Power & Light Company, 85 N.J. 520, 428 A.2d 498 (1981) and argue that the Board's decision was not a rate increase but rather a policy decision since it did not approve any particular rate increase or mechanism.
In Jersey Central, supra, the cross-appellant argued that the Board's decision to uphold a public utilities' request to accelerate the amortization of its deferred energy account violated the APA and procedural due process. Id. at 528, 428 A.2d 498. We rejected this argument holding that "neither procedural due process nor the APA required the Board to provide particularized notice of its specific intention to make a policy determination with respect to accelerated amortization of the deferred energy balance." Ibid. We noted that appellant had not shown prejudice by a lack of notice but found that
[i]n view of the unique circumstances surrounding the Board's decision on this issue, including [cross-appellant]'s precarious financial situation and the fact that the Board's decision did not result in a rate increase, we find that the Board was acting within its discretionary power when it ordered the accelerated amortization of the deferred energy balance.
[Ibid.]
Joint respondents and the Board argue that this was not a rate increase since the Board did not set a specific rate and directed the EDCs "to submit . . . a proposed rate recovery mechanism[,]" a process in which Rate Counsel would participate. We agree. Even though the costs of complying with RPS passed to ratepayers, the hearing scheduled by the Board decides the method of payment and the amount of any increase.
Here, the Board's order issued in June 22, 2007, inviting comments for the BGS procedures, did not mention the pass through of costs to ratepayers. The initial comments also did not include any proposal to pass through the costs. The issue did not arise until IEPNJ submitted comments on September 30, 2007, suggesting the pass through as an option, comments appellant claims it did not see.
*448 However, joint respondents and the BPU argue that Rate Counsel was put on notice since the issue was first raised in "early 2007" during the Board's consideration of whether the SACP levels should be kept at $300 per MWH.
Rate Counsel's argument here echoes the argument it raised in In re PSE & G, supra, 330 N.J.Super. at 117, 748 A.2d 1161, and should be rejected here just as it was there. In In re PSE & G, Rate Counsel asserted that the BPU "improperly" relied on a document (the ICF Report) that was not formally admitted into evidence. We rejected Rate Counsel's argument, finding that it was sufficient that Rate Counsel received a copy of the documents and although written comments were not requested, nothing prevented Rate Counsel from responding, especially since there was considerable time (10 months) before the final decision was entered. We reasoned,
Because the [Ratepayer Advocate] had notice of the ICF report and an opportunity to respond to it, we conclude that the BPU's reliance on the report was not a procedural irregularity sufficient to deny the [Ratepayer Advocate] due process. It was neither fundamentally unfair, nor rose to the level required under N.J.S.A. 48:2-46 for setting aside the order.
[Ibid.]
That reasoning is equally applicable here. As explained in its June 16, 2008 Order on Motions to Settle the Record, while Rate Counsel maintained that the IEPNJ comments were not "properly filed" with the Board, they were posted to the electronic list server, and the Board had no reason to believe that the comments had not circulated to all parties.
We conclude that even if Rate Counsel did not receive direct notice, the comments were placed on the list serve and it had sufficient time to respond in a timely manner to have its objections considered by the Board. Rate Counsel cannot consider these issues in a vacuum. The ultimate responsibility for the costs was an on-going issue long preceding the November 8 hearing, and because the rate recovery mechanism is still under consideration, the critical issue raised by Rate Counsel has yet to be resolved.
Lastly, we reject, with only brief comments, Rate Counsel's argument that the Board's decision was arbitrary or capricious and without a substantial basis in the record.
The BPU has been given broad authority in the general supervision, regulation of and jurisdiction and control over public utilities. N.J.S.A. 48:2-13. The proceedings and decisions in this matter involve policy decisions by the BPU concerning the provision of electric supply and the allocation of costs under N.J.S.A. 48:3-57. The Legislature has delegated its power over the activities of public utilities and has vested the Board with broad discretion in the exercise of that authority. Public Service, supra, 167 N.J. at 384, 771 A.2d 1163 (citing In re Public Serv. Coordinated Transp., 5 N.J. 196, 214, 74 A.2d 580 (1950)).
Expert determinations of the BPU, when challenged on appeal, are entitled to presumptive validity, since they involve significant questions of public policy. Jersey Central, supra, 85 N.J. at 527, 428 A.2d 498. Upon appellate review, our role is not to substitute our judgment for that of the Board, particularly when that judgment reflects agency expertise. Public Service, supra, 167 N.J. at 384, 771 A.2d 1163 (citing Flanagan v. Dep't. of Civil Serv., 29 N.J. 1, 12, 148 A.2d 14 (1959); Close v. Kordulak Bros., 44 N.J. *449 589, 599, 210 A.2d 753 (1965)). Indeed, N.J.S.A. 48:2-46 forecloses the setting aside of BPU Orders except "when it clearly appears that there was no evidence before the [BPU] to support the same reasonably or that the same was without the jurisdiction of the [BPU]." Accordingly, on appeal from a BPU Order, we confine our inquiry to whether there exists competent and relevant evidence in the record to furnish a reasonable basis for the BPU's action. Under these circumstances, the BPU's ruling will not be disturbed unless the we find "a lack of `reasonable support in the evidence.'" Public Service, supra, 167 N.J. at 385, 771 A.2d 1163, (citing Jersey Central, supra, 85 N.J. at 527, 428 A.2d 498; In re New Jersey Power and Light Co., 9 N.J. 498, 509, 89 A.2d 26 (1952)). Where, as in this case, there is evidence on the issues addressed, no findings made or conclusions reached that are based on that evidence and are otherwise within the BPU's discretionary authority will be seen to be arbitrary, capricious or unreasonable. In re Application of N.J. Bell Tel. Co. for Approval of its Plan for Alternative Regulation, 291 N.J.Super. 77, 89, 676 A.2d 1133 (App.Div.1996).
Courts also normally defer to the procedure chosen by the agency in discharging its statutory duty. In re Request For Solid Waste Util. Customer Lists, 106 N.J. 508, 519, 524 A.2d 386 (1987). Moreover, under N.J.S.A. 48:2-46, no BPU Order shall be set aside in whole or part for any irregularity or informality in the proceedings unless the procedural defect tends to defeat or impair a substantial right or interest of the appellant.
The BPU in this case is required to implement certain provisions of EDECA as a result of the restructuring of the electric industry and the transition to competitive energy supply markets. In particular, N.J.S.A. 48:3-57a(1) empowers the BPU to regulate BGS charges to customers based upon "the reasonable and prudent cost to the utility of providing such service, including the cost of power purchased at prices consistent with market conditions by the electric public utility in the competitive wholesale marketplace and related ancillary and administrative costs, as determined by the board." Balancing the competing interests of suppliers, BGS customers and the EDCs, the BPU each year has directed the EDCs to file a proposal for obtaining BGS Supply, and, to date, has adopted the BGS auction as the vehicle for fulfilling that obligation.
N.J.S.A. 48:3-57e provides that an EDC that provides BGS shall be permitted to recover, on a full and timely basis, "all reasonable and prudently incurred costs incurred in the provision of basic generation services consistent with the provisions of this section[.]" In implementing EDECA, the Legislature also declared numerous policy goals related to the need to lower the high cost of energy, ensure universal access to affordable and reliable electric power service and increase the use of renewable energy. N.J.S.A. 48:3-87d empowers the BPU to adopt renewable energy portfolio standards, which require that an increasing percentage of the energy provided within the State come from alternative energy sources.
As we have previously noted, the issues raised here cannot be considered in a vacuum. Cost and responsibility has been the subject of varied proceedings before the Board for an extended period of time. We conclude that the Board acted properly in addressing these issues.
Affirmed.
NOTES
[1] The joint respondents are: Public Service Electric And Gas Company; PSEG Energy Resources & Trade, LLC; Jersey Central Power & Light Company; Conectiv Energy Supply, Inc.; Independent Energy Producers of New Jersey; Consolidated Edison Energy, Inc.; Constellation Energy Commodities Group, Inc.; Constellation Newenergy, Inc., and J.P. Morgan Ventures Energy Corporation.
[2] Joint respondents claim that Public Service Electric and Gas Company (PSE & G) also made this suggestion, but PSE & G is not mentioned in the order.
[3] "Tranche" is defined as "a portion, share, installment." Webster's New World Dictionary 1419 (3d College ed. 1988).
[4] The Board states that on May 1, 2008, the EDCs filed a joint proposal setting out the rate recovery mechanism, which is still under review at this time.
[5] Rate Counsel incorrectly cites N.J.S.A. 48:2-21(d) in support of this proposition. Subsection (d) pertains to Board hearings when a public utility raises the rates. In the case at hand, it was the Board's action that affected the ratepayers, not the public utility. Therefore N.J.S.A. 48:2-21(b) is more appropriate since it allows the Board to fix rates "after hearing, upon notice, by order in writing.. . ."