**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2876-15

IN THE MATTER OF THE
PETITION OF NEW JERSEY
NATURAL GAS COMPANY
FOR APPROVAL AND
AUTHORIZATION TO
CONSTRUCT AND OPERATE
THE SOUTHERN RELIABILITY
LINK PURSUANT TO N.J.A.C.
14:7-1.4.

_____

Argued April 13, 2021 – Decided April 29, 2021

Before Judges Yannotti, Haas and Natali.

On appeal from the New Jersey Board of Public Utilities, No. GE15040402.

Paul Leodori argued the cause for appellant Pinelands Preservation Alliance (Paul Leodori, PC, attorneys; Todd M. Parisi, on the briefs).

Geoffrey R. Gersten, Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Andrew M. Kuntz, Deputy Attorney General, and Geoffrey R. Gersten, on the brief).

James C. Meyer argued the cause for respondent New Jersey Natural Gas Company (Riker Danzig Scherer Hyland & Perretti, LLP, attorneys; Kevin H. Marino and John A. Boyle, on the brief).

Maura A. Caroselli, Assistant Deputy Rate Counsel, argued the cause for respondent New Jersey Division of Rate Counsel (Stephanie A. Brand, Director, attorney; Maura A. Caroselli, on the brief).

PER CURIAM

This appeal arises from a petition filed by respondent New Jersey Natural Gas Company (NJNG) for a permit needed to construct a natural gas pipeline through several municipalities and a portion of the Pinelands Area. On August 19, 2015, the Board of Public Utilities (Board) denied appellant Pinelands Preservation Alliance's (PPA's) motion to require the Board to conduct an adjudicatory hearing on the petition and to grant PPA intervenor or participant status in the Board's review process. On January 28, 2016, the Board granted NJNG's petition for the required permit.

PPA appeals from the Board's decisions. Having reviewed PPA's contentions in light of the record and applicable law, we affirm.

I.

The parties are familiar with the procedural facts and history of this matter, which are also discussed in our decision today in PPA's companion

appeal in Docket Nos. A-3666-15 and A-3752-15.[1]  To avoid repetition, we incorporate that discussion here by reference.  Therefore, we need only recite the most salient history in this opinion.

NJNG is a New Jersey public utility engaged in the business of purchasing, distributing, transporting, and selling natural gas in Morris, Middlesex, Monmouth, and Ocean Counties, and the most southeastern portion of Burlington County.  While NJNG's northern service area was connected to five interstate transmission feeds, three of which could independently supply that entire region, NJNG's central and southern service areas were connected to the Texas Eastern Transmission (TETCO) gas pipeline, a single interstate feed located outside of NJNG's franchise area in Middlesex County.

On April 2, 2015, NJNG filed the MLUL petition with the Board proposing the construction and operation of an interstate natural gas transmission pipeline to be known as the Southern Reliability Link (SRL).  As explained in its MLUL petition, NJNG designed the SRL "to maintain system

---

[1]  In that appeal, PPA and the Sierra Club (SC) challenged the Board's March 18, 2016 decision granting NJNG's petition for a ruling that the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, and any local governmental development regulations adopted pursuant to the MLUL, would not apply to the construction of the pipeline.  In our opinion in that matter, we affirm the Board's approval of NJNG's MLUL petition.

integrity and reliability by creating a new, redundant major feed of natural gas supplies from a second interstate transmission system." The SRL would connect NJNG's existing natural gas system to a new interstate supply point located in Chesterfield and operated by the Transcontinental Pipe Line Company (Transco). The SRL would run from that supply point through six townships: Chesterfield, North Hanover, Upper Freehold, Plumsted, Jackson, and Manchester. A 12.1 mile portion in Ocean County, which included right-of-way (ROW) areas located within and alongside the Joint Base McGuire-Dix-Lakehurst (Joint Base), would cross the State-designated Pinelands Preservation Area, N.J.S.A. 13:18A-2, -9, and -11(b). NJNG filed an amended MLUL petition incorporating a new route through Upper Freehold Township on June 5, 2015.[2]

Simultaneously with its MLUL petition, NJNG filed a "safety petition" with the Board in accordance with N.J.A.C. 14:7-1.4. That regulation requires: (1) Board approval prior to the construction or operation of a natural gas pipeline

_____

[2] Because the pipeline would cross the Pinelands Preservation Area, NJNG also filed an application with the Pinelands Commission (Commission) for approval to construct the pipeline in the Pinelands. The Commission granted NJNG's application on September 14, 2017. PPA and SC later filed separate appeals challenging the Commission's decision. Docket Nos. A-925-17 and A-1004-17. In an opinion also filed on this date, we affirm the Commission's approval of the application.

that is intended to be operated in excess of 250 psig (pound-force per square inch gauge pressure), and is located within 100 feet of any building intended for human occupancy; and (2) the pipeline to satisfy the federal requirements set forth in chapter 49 C.F.R. 192, which "prescribes minimum requirements for the design and installation of pipeline components and facilities" and "prescribes requirements relating to protection against accidental overpressuring," 49 C.F.R. § 192.141.

Specifically, the SRL would operate at "an MAOP [(maximum allowable operating pressure)] of 722 psig" in the six municipalities it crossed and be located within 100 feet of 141 structures intended for human occupancy, of which 130 were residential and 11 were commercial. NJNG's petition which, like the MLUL petition, was amended in June 2015, further stated in technical terms:

> The Project's proposed transmission line will be constructed of 30-inch outside diameter steel pipe with a 0.500 inch wall thickness. It will be manufactured in accordance with the applicable American Petroleum Institute ("API") Standard 5L with specified minimum yield strength of 60,000 psi and minimum tensile strength of 75,000 psi. The Project will be constructed in full accordance with N.J.A.C. 14:7 and the Federal Regulations for the Transportation of Natural and Other Gas By Pipeline, Part 192, Title 49 of the Code of Federal Regulations ("49 CFR 192"). It is designed for Class 4 Location and will be designed to accommodate

5

future in-line inspection ("ILI") devices, in accordance with the requirements for passage of internal inspection devices at 49 CFR 192.150. Additionally, as required in 49 CFR 192.901 through 192.951 (Subpart O), NJNG has an Integrity Management Program in place.

The Project's proposed transmission line will be subjected to 100% non-destructive testing on all welds and a minimum of 1,500 psig of hydrostatic test pressure for 24 hours. As part of this test, it will be subjected to a strength test pressure of approximately 1,800 psig for no greater than one hour, intended to produce 90% of its Specified Minimum Yield Strength. As a result, the MAOP of this section of 30-inch main will be rated at 722 psig, an equivalent MAOP to that of NJNG's existing transmission system. The engineering specifications are detailed on the "Pipeline Engineering Data Sheet" attached to the April 2, 2015 Petition as Exhibit C.

Route studies were performed to determine a route that will minimize and balance the impact to the natural environment and the built environment, taking into consideration the feasibility of constructing the Project. Of the feasible buildable alternatives, the route selected by NJNG, as reflected in the April 2, 2015 Petition, represents that alternative with the least impacts. The Alternatives Analysis is attached to the April 2, 2015 Petition as Exhibit E.

The [SRL] Project was developed as a redundant supply line to an existing system in which additional growth of the system was not taken into account during its design, so no Smart Growth impact is anticipated.

6

In June 2015, PPA filed a motion for leave to intervene in the Board's review of NJNG's safety petition pursuant to N.J.A.C. 1:1-16.2 or, in the alternative, for leave to participate pursuant to N.J.A.C. 1:1-16.6.

After considering PPA's contentions at an agenda meeting on August 19, 2015, the Board concluded in a thorough written decision that PPA did not have a constitutional or statutory right to an adjudicatory hearing on NJNG's safety petition, and had not demonstrated its entitlement to either intervenor or participant status in the permit review process. However, the Board granted PPA participant status at the evidentiary hearing conducted by Board Commissioner Dianne Solomon on NJNG's MLUL petition. In addition, PPA participated at public hearings held by Commissioner Solomon on both the safety petition and the MLUL petition.

The public hearings were well attended, and the Board received over 1000 written comments concerning the SRL project. With particular reference to NJNG's safety petition, Michael Stonack, Chief of the Board's Bureau of Pipeline Safety, stated that pursuant to State and federal regulations, NJNG was required to install remote controlled valves on the SRL for emergency shutdown. NJNG also had to develop a comprehensive transmission pipeline integrity management program that included performing inline inspections with devices

known as "smart pigs." In addition, NJNG was required to provide full-time inspectors, qualified by training and experience, to oversee the construction and ensure State and federal regulatory compliance.

Stonack further reported that the Board's staff had determined the proposed SRL was "in compliance with State and [f]ederal pipeline safety regulations." The staff had reviewed NJNG's design and construction plans and had performed field inspections of the entire proposed pipeline route and various alternative routes. "Board staff are charged with making recommendations to the Board." Stonack also stated that the staff intended to conduct pipeline safety compliance inspections during the construction, as well as perform future operating and maintenance inspections as part of the Board's ongoing "Pipeline Safety Program."

Jaclyn Rhoads, PPA's Assistant Executive Director, along with PPA's legal counsel, objected to the SRL, claiming that NJNG had provided conflicting statements about the project's purpose, had not demonstrated the pipeline was necessary for maintaining or safeguarding the region's natural gas supply, and had not provided clear justification showing the Joint Base's need to have or use the pipeline in association with the function of that federal installation. They further asserted that NJNG had not addressed ecological disruptions and impacts

on endangered species during construction, and claimed that the Board could not waive compliance with the requirements of the Pinelands Protection Act (Pinelands Act), N.J.S.A. 13:18A-1 to -29, and the Pinelands Comprehensive Management Plan (CMP) during any evaluations of NJNG's petitions. Counsel also asserted that NJNG was constructing the pipeline for profitability, not reliability, and that its cost should not be passed onto ratepayers.

On January 27, 2016, the Board considered NJNG's safety petition at an agenda meeting. Stonack advised the Commissioners on the petition, answered their questions about alternative routes, and summarized the objections received at the public hearings. He also reported that, because "one of our major objectives was [to] try and mitigate the number of structures within 100 feet" of the pipeline, the Board's staff had reviewed all of the possible alternative routes and found that NJNG's proposed route was "the least impactful and, therefore, [was] deemed to be the best alternative." Stonack explained:

> Board staff worked with [NJNG] on the pipeline alignment to mitigate the number of human-occupied structures within 100 feet of the pipeline. The proposed route proved to be the most viable upon reviewing a number of factors, including impacts to the public, structures, existing infrastructure, and the natural environment, in addition to engineering and construction considerations.

9

I might mention that there were certain cases where we weren't satisfied with the location of the pipeline, [and] the amended route as it was originally proposed, and we had asked the company to move the pipeline slightly to be further away from structures and they agreed to do so. But those changes don't mean that there were considerable alignment changes relative to where the pipeline is located along the routes, the county roads that are part of the proposed alignment.

So in certain cases -- an example is we asked them to move the pipeline further into the road so that it was further away from structures. We had situations where we talked about moving the pipelines to the opposite side of the road -- those kinds of things.

Thus, based on NJNG's inspection protocols and safety measures, the pipeline's proposed wall thickness and installation depth, and a record indicating the SRL would meet or exceed State and federal standards, the staff found NJNG's safety petition "reasonable" and recommended Board approval. At the end of the meeting, the Board unanimously voted to accept the staff's recommendation.

On January 28, 2016, the Board issued a written decision and order approving NJNG's safety petition. The Board stated that its staff had: (1) reviewed NJNG's proposal including "the Project design, construction plans and specifications, [and] the listing of structures within one hundred (100) feet of the Pipeline and their distances from the Pipeline alignment"; (2) "conducted a

10

full field inspection of the entire Pipeline route"; and (3) considered all of the possible and alternate routes. Additionally, Board staff had "worked with" NJNG

> on the Pipeline alignment to mitigate the number of human-occupied structures within one hundred (100) feet of the Pipeline. Several changes were agreed upon that do not change the overall route of the Pipeline, but have resulted in moving the Pipeline further away from certain buildings intended for human occupancy, where appropriate.

Based on that review, the Board determined that NJNG's proposed SRL project met the safety requirements of N.J.A.C. 14:7 and satisfied even more stringent standards than required by many federal pipeline regulations. The Board explained:

> For additional safety, during the pipeline construction, seven (7) remote controlled valves for emergency shutdown will be installed by NJNG. In accordance with the requirements of N.J.A.C. 14:7-1.12, NJNG will comply with a minimum four (4) feet depth of cover over the Pipeline[ ] and Board Staff is requiring the installation of two (2) twelve (12) inch wide warning tapes[ ], side by side, over the Pipeline as an additional damage prevention measure for the Pipeline. Also, the Pipeline will be constructed using higher strength steel pipe with yield strength equal to 60,000 pounds per square inch ("psi"). In addition, Board Staff is requiring NJNG to complete an initial integrity assessment of the Pipeline using inline inspection devices within five (5) years from the date the Pipeline is installed and placed into operation[ ].

[NJNG] will have full-time inspectors, qualified by training and experience, overseeing the Pipeline construction to ensure that the Pipeline is constructed and installed in accordance with State and Federal requirements. All Pipeline welders will be qualified by testing in accordance with the weld procedure qualified for 60,000 psi yield strength pipe and all welds completed during the Pipeline construction will be x-rayed to ensure the integrity of the welds. In addition, Board Staff will conduct Pipeline safety compliance inspections during the construction of this Pipeline, as well as perform future operating and maintenance inspections on it as part of the Board's ongoing Pipeline Safety Program. In accordance with N.J.A.C. 14:7-1.20, NJNG will perform inspection patrols at least once per month to observe surface conditions on and adjacent to the Pipeline right of way [sic] for indications of leaks, construction activity and other factors affecting safety and operation[ ]. NJNG shall maintain with the Board a valve assessment and emergency closure plan for the Pipeline and shall assess each Pipeline valve on an annual basis. In addition, as required by N.J.A.C. 14:7-1.22, NJNG will provide on-site inspection oversight immediately prior to and during any excavation and backfilling, and for bored or horizontally directional drilled installations performed by other excavators in the vicinity of the Pipeline. NJNG will provide the pressure testing certification and documentation required by N.J.A.C. 14:7-1.14 prior to placing the Pipeline in operation.

[(footnotes omitted).]

The Board determined that, "[t]aken together, all of these safety and preventative measures ensure[d] the integrity of the Pipeline and enhance[d] public safety." Accordingly, it concluded that NJNG's request to construct and

12

operate the SRL was "reasonable and . . . in compliance with all relevant [f]ederal and State requirements." The Board therefore approved NJNG's safety petition to construct the SRL pipeline pursuant to N.J.A.C. 14:7-1.4,

> subject to the approval of all environmental permits required by the New Jersey Department of Environmental Protection, approval of road opening permits from the affected counties and municipalities, all other permits and approvals, if any, the approval of traffic control and detour plans with the affected jurisdictions, the installation of two (2) twelve (12) inch wide warning tapes, side by side, over the Pipeline, the pressure testing requirements of N.J.A.C. 14:7-1.14 prior to placing the Pipeline into operation, and completion of an initial integrity assessment of the Pipeline using inline inspection devices within five (5) years from the date the Pipeline is installed and placed into operation . . . .

Thereafter, PPA filed a notice of appeal from the Board's August 19, 2015 order denying its motion to intervene or participate, and the Board's January 28, 2016 order approving NJNG's safety petition. We consider each of these orders in turn.

## II.

PPA first contends that the Board's August 19, 2015 order deciding that NJNG's safety petition was an uncontested case and, therefore, denying PPA's motion for intervenor or participant status was arbitrary and capricious. We disagree.

13

Generally, an administrative agency has discretion in choosing the "procedural mode of action" it will perform within the agency in the exercise of its decision-making functions; but this "procedural mode" is "valid only when there is compliance with the provisions of the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15, and due process." In re Provision of Basic Generation Serv. for Period Beginning June 1, 2008, 205 N.J. 339, 347 (2011). "The APA provides a road map for navigating administrative proceedings." In re License of Fanelli, 174 N.J. 165, 172 (2002).

Under the APA, "all interested persons are afforded reasonable opportunity to submit data, views or arguments, orally or in writing, during any proceedings involving a permit decision." N.J.S.A. 52:14B-3.1(a). Due process also requires "notice and opportunity to be heard." In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 384 (2013). However, a formal or evidentiary hearing is clearly not required in every administrative matter. Wolff v. McDonnell, 418 U.S. 539, 557 (1974) (discussing due process); In re Request for Solid Waste Util. Customer Lists, 106 N.J. 508, 520 (1987) (discussing APA). "[A]gencies enjoy a great deal of flexibility in selecting the proceedings most suitable to achieving their regulatory aims." Bally Mfg. Corp. v. N.J. Casino Control Comm'n, 85 N.J. 325, 338 (1981). See Texter v. Dep't of Hum.

Servs., 88 N.J. 376, 385 (1982) (stating agency has discretion "to select those procedures most appropriate to enable the agency to implement legislative policy").

In this regard, our review of an agency's decision is limited. In re Carter, 191 N.J. 474, 482 (2007). "Normally courts defer to the procedure chosen by the agency in discharging its statutory duty." Customer Lists, 106 N.J. at 519. Nevertheless, "[a]n appellate court may reverse an agency decision if it is arbitrary, capricious, or unreasonable." Montclair Founders Grp., 216 N.J. at 385. As our Supreme Court has explained:

> Although sometimes phrased in terms of a search for arbitrary or unreasonable agency action, the judicial role [in reviewing an agency action] is generally restricted to three inquiries: (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Id. at 385-86 (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

See also N.J.S.A. 48:2-46 (stating that "[n]o [Board] order shall be set aside in whole or in part for any irregularity or informality in the proceedings of the

15

board unless the irregularity or informality tends to defeat or impair the substantial right or interest of the appellant").

In addition, we usually "defer to an agency's interpretation of both a statute and implementing regulation, within the sphere of the agency's authority, unless the interpretation is plainly unreasonable." Ardan v. Bd. of Rev., 231 N.J. 589, 604 (2018) (quoting In re Election Law Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010)). However, we are "in no way bound by the agency's interpretation . . . or its determination of a strictly legal issue." Ibid. (quoting US Bank, N.A. v. Hough, 210 N.J. 187, 200 (2012)). Accord In re Implementation of L. 2018, C. 16 Regarding Establishment of Zero Emission Certificate Program for Eligible Nuclear Power Plants, ___ N.J. Super. ___ (slip op. at 42) (App. Div. 2021).

A motion to intervene in an administrative proceeding is governed by N.J.A.C. 1:1-16.1(a) (emphasis added), which states that "[a]ny person or entity not initially a party, who has a statutory right to intervene or who will be substantially, specifically and directly affected by the outcome of a contested case, may on motion, seek leave to intervene." The regulations further provide:

> (a) In ruling upon a motion to intervene, the [agency] shall take into consideration the nature and extent of the movant's interest in the outcome of the case, whether or not the movant's interest is sufficiently different from

that of any party so as to add measurably and constructively to the scope of the case, the prospect of confusion or undue delay arising from the movant's inclusion, and other appropriate matters.

(b) In cases where one of the parties is a State agency authorized by law to represent the public interest in a case, no movant shall be denied intervention solely because the movant's interest may be represented in part by said State agency.

(c) Notwithstanding (a) above, persons statutorily permitted to intervene shall be granted intervention.

[N.J.A.C. 1:1-16.3.]

By contrast, a motion to participate may be made by any entity "with a significant interest in the outcome of a case." N.J.A.C. 1:1-16.6(a) (emphasis added). "In deciding whether to permit participation, the [agency] shall consider whether the participant's interest is likely to add constructively to the case without causing undue delay or confusion." N.J.A.C. 1:1-16.6(b).

An important difference between the two statuses is: intervenors in a contested case are non-parties who "obtain all rights and obligations of a party," N.J.A.C. 1:1-2.1, including direct involvement in any required hearing. However, participation is limited to: (1) oral argument; (2) filing a statement or brief; and/or (3) filing exceptions to an initial decision with the agency head. N.J.A.C. 1:1-16.6(c).

Thus, as a threshold issue before deciding an intervention motion, the agency head must determine whether the matter before the agency is classified as a contested case within the intent of the APA. See Sloan ex rel. Sloan v. Klagholtz, 342 N.J. Super. 385, 392 (App. Div. 2001) (stating "agency head has exclusive authority to determine whether an administrative matter is a 'contested case' within the intent of the APA") (citing N.J.S.A. 52:14F-7(a)). This is a "discretionary decision." Quad Enters. v. Borough of Paramus, 250 N.J. Super. 256, 263 (App. Div. 1991).

The term "contested case" "does not merely refer to whether sufficient adversity exists between the parties . . . . [A] matter is a contested case where, by virtue of statute or constitutional requirement, a hearing is required before a State agency to determine rights, duties, obligations, privileges, benefits or other legal relations of specific parties." 37 N.J. Practice, Administrative Law & Practice § 4.7, at 185 (Steven L. Lefelt, Anthony Miragliotta, and Patricia Prunty) (2d ed. 2000). The APA defines "contested case" as

> a proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing . . . .

[N.J.S.A. 52:14B-2.]

This statutory definition is mirrored in N.J.A.C. 1:1-2.1, which also adds

that a contested case "means an adversary proceeding," and that

> [t]he required hearing must be designed to result in an adjudication concerning the rights, duties, obligations, privileges, benefits or other legal relations of specific parties over which there exist disputed questions of fact, law or disposition relating to past, current or proposed activities or interests. Contested cases are not informational nor intended to provide a forum for the expression of public sentiment on proposed agency action or broad policy issues affecting entire industries or large, undefined classes of people.
>
> [N.J.A.C. 1:1-2.1 (emphasis added).]

By contrast, the term "'[u]ncontested case' means any hearing offered by an

agency for reasons not requiring a contested case proceeding under the statutory

definition of contested case." N.J.A.C. 1:1-2.1.

We have adopted the following test for agencies to use in determining

whether a matter is contested or an uncontested case within the intendment of

these regulatory definitions:

> [T]o determine whether a dispute is a contested case, there are three questions which must be answered affirmatively. First, is a hearing required by statute or constitutional provision; second, will the hearing result in an adjudication concerning rights, duties, obligations, privileges, benefits or other legal relations;

and third, does the hearing involve specific parties rather than a large segment of the public?

> [Bd. of Educ. of Upper Freehold Reg'l Sch. Dist. v. State Health Benefits Comm'n, 314 N.J. Super. 486, 494 (App. Div. 1998) (quoting 37 N.J. Practice, Administrative Law & Practice § 119, at 137 (Steven L. Lefelt) (1988)).[3]]

Here, the Board applied this test and determined that its review of NJNG's safety petition was an uncontested case that did not require an administrative hearing. In doing so, the Board first asked whether PPA had a statutory or constitutional right to a hearing and concluded it clearly did not. In addition, the Board found that N.J.A.C. 14:7-1.4 did not require it to weigh any factual findings in reaching its decision on NJNG's petition. The Board explained:

> N.J.A.C. 14:7-1.4 . . . only requires Board approval prior to the installation and/or operation of a pipeline in excess of two-hundred fifty (250) psig if the proposed pipeline alignment is planned to pass within one-hundred (100) feet of any building intended for human occupancy, and does not require the Board to conduct an evidentiary hearing. Therefore, the Board's review of the petition is narrow in scope, and it is only tasked with determining whether the Project is in conformity with [S]tate and federal natural gas pipeline regulations and ensuring that the number of habitable dwellings within one-hundred (100) feet of the Project is

---

[3] This quote is the same as found in the current version of the New Jersey Practice. See 37 N.J. Practice, Administrative Law & Practice § 4.7, at 185 (Steven L. Lefelt, Anthony Miragliotta, and Patricia Prunty) (2d ed. 2000) (footnotes omitted).

minimized. The Board is not tasked with making any findings of fact or a determination as to whether the Project is necessary.

Thus, without needing to address the other two questions set forth in the Upper Freehold test, the Board classified NJNG's safety petition as an uncontested case, which gave PPA no right to intervene or participate.

On appeal, PPA argues that the Board violated its constitutional due process rights by classifying NJNG's safety petition as an uncontested case and denying the motion to intervene. It claims a constitutional right to a hearing not only to protect the Pinelands and its management program from inappropriate development, but also to maintain a safe and secure environment for the happiness of its own members. PPA relies on Article I, Paragraph 1 of the New Jersey Constitution, which states that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights," including "enjoying and defending life and liberty, . . . protecting property, and . . . pursuing and obtaining safety and happiness." N.J. Const. art. I, ¶ 1.

However, PPA's claim to a contested case classification for NJNG's safety petition is critically undermined by its failure to raise a material issue of fact as to the Board's actual review requirements in N.J.A.C. 14:7-1.4. "[I]t is the presence of disputed adjudicative facts, not the vital interests at stake, that

requires the protection of formal trial procedure" for due process. <u>High Horizons Dev. Co. v. State, Dep't of Transport.</u>, 120 N.J. 40, 53 (1990). <u>See</u> <u>In re NJPDES Permit No. NJ00025241</u>, 185 N.J. 474, 486 (2006) ("There must exist a dispute about adjudicative facts that affects the permit decision."). Our Supreme Court has said that "[c]ontested cases are those in which the Constitution or a statute requires an adjudicatory hearing" but "[i]t is only when the proposed administrative action is based on disputed adjudicative facts that an evidentiary hearing is mandated." <u>Customer Lists</u>, 106 N.J. at 517 (quoting <u>Texter</u>, 88 N.J. at 384.)

N.J.A.C. 14:7 sets forth the "requirements that govern the construction, operation and maintenance of intrastate transmission and distribution pipelines for the transportation of natural gas by intrastate natural gas pipeline operators." N.J.A.C. 14:7-1.1(a). The specific standard applied by the Board when considering a petition filed by a utility company under N.J.A.C. 14:7-1.4 is reflected in that regulation, which provides:

> (a) No person shall install and/or operate a natural gas pipeline with a maximum operating pressure in excess of 250 psig within 100 feet of any building intended for human occupancy . . . unless such person has obtained prior Board approval of the installation and/or operation of the pipeline.
>
> . . . .

22

(c) A request for approval of the installation and/or operation of a transmission pipeline shall be subject to the requirements of 49 CFR 192, including the requirements for passage of internal inspection devices at 49 CFR 192.150, and for an integrity management program in Subpart O, 49 CFR 192.901 through 192.951.

N.J.A.C. 14:7-1.4 therefore required the Board to determine only whether the SRL project was in conformity with State and federal natural gas pipeline regulations and with ensuring that the number of habitable buildings within 100 feet was minimized. That is, during its review of NJNG's safety petition, the Board was simply "receiving general facts which [would] help it decide," using its specialized expertise, whether the SRL pipeline met the technical State and federal standards governing pipeline construction, operation and maintenance, and a contested case hearing was not required. In re Application of N. Jersey Dist. Water Supply Comm'n, 175 N.J. Super. 167, 203-04 (App. Div. 1980) (stating "a hearing is not required when an agency is receiving general facts which will help it decide questions of law, policy and discretion") (citing Cunningham v. Dep't of Civ. Serv., 69 N.J. 13, 22 (1975)). Thus, even without examining the other two parts of the test established in Upper Freehold, the Board did not err by concluding that NJNG's safety petition was not a contested case.

Contrary to PPA's arguments, there are no environmental or threatened or endangered species concerns, alternative routes issues, or CMP-related compliance questions compulsory to the Board's review of NJNG's safety petition pursuant to N.J.A.C. 14:7-1.4. 49 C.F.R. §§ 192.1 to 192.1013 "prescribe[] minimum requirements for the design and installation of pipeline components and facilities. In addition, [that chapter] prescribes requirements relating to protection against accidental overpressuring." 49 C.F.R. § 192.141. Thus, the Board did not err by concluding that PPA was not entitled to intervenor status to challenge NJNG's safety petition and raise issues of the SRL's compliance with the Pinelands Act and CMP Rules. Also, because PPA's stated Pinelands, CMP-related, and environmental "interest[s]" were not "likely to add constructively to the case without causing undue delay or confusion," N.J.A.C. 1:1-16.6(b), the Board did not err by concluding that PPA was not entitled to participant status to challenge NJNG's safety petition.

Accordingly, we are satisfied that the Board's August 19, 2015 determinations to treat NJNG's safety petition as an uncontested case and to deny PPA's motion for intervenor or participant status were not arbitrary, capricious, or unreasonable. Therefore, we reject PPA's contentions on this point.

PPA next challenges the Board's January 28, 2016 decision granting NJNG's safety petition. As it did in its appeal from the Board's approval of NJNG's MLUL petition, PPA asserts that the Board's failure to address whether the SRL project complied with the Pinelands Act and related CMP Rules rendered its decision arbitrary and capricious. Specifically, PPA argues that the SRL's proposed route did not comply with those statutory and regulatory Pinelands' requirements, and that the Board's alternative route analysis was incomplete and unreliable because it never considered the fact that the SRL would be crossing two federal superfund sites, a federal military installation, and the State-designated Pinelands Preservation Area.

PPA's arguments on this point lack merit for the reasons discussed in our opinion concerning PPA's similar challenge to NJNG's MLUL petition.[4] Simply stated, the Board had no authority to review NJNG's proposed construction for compliance with the Pinelands Act, the CMP Rules, or with any other environmental statutory scheme. Indeed, as we recently held in In re Petition of S. Jersey Gas Co., 447 N.J. Super. 459, 482 (App. Div. 2016), only the Commission has the expertise and exclusive legislative authority to decide

---

[4] Docket Nos. A-3666-15 and A-3752-15.

whether a pipeline project complies with the Pinelands Act and CMP Rules. Therefore, we reject PPA's argument that the Board's decision on NJNG's safety petition was arbitrary or unreasonable because the Board did not make determinations on environmental issues that were within the Commission's jurisdiction.

Moreover, the Board specifically stated in its January 28, 2016 opinion that its decision to grant the safety petition "was subject to the approval of . . . all other permits and approvals . . . ." This language sufficiently accounts for the need for prior approval by the Commission. Just as importantly, the Commission adopted a resolution on September 14, 2017 approving NJNG's application to construct the pipeline in the Pinelands. Thus, there is no merit to PPA's contention that the Board waived compliance with the Pinelands Act and the CMP Rules.

All other arguments raised in this appeal, to the extent we have not addressed them are with sufficient merit to be discussed. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2876-15